1

Evan R. Chesler (Bar No. N/A)
echesler@cravath.com

2

Keith R. Hummel (*pro hac vice forthcoming*)
khummel@cravath.com

3

Yonatan Even (*pro hac vice forthcoming*)
yeven@cravath.com

4

Lauren Rosenberg (*pro hac vice forthcoming*)
lrosenberg@cravath.com

5

**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue

6

New York, New York 10019
Telephone:  (212) 474-1000

7

Facsimile:  (212) 474-3700

8

*Attorneys for Plaintiff Unlockd Media, Inc. Liquidation Trust*

9

10

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

11

12

13

UNLOCKD MEDIA, INC.
LIQUIDATION TRUST, by and

14

through its duly appointed trustee,
Peter S. Kaufman,

15

16

Plaintiff,

17

v.

18

GOOGLE LLC; GOOGLE IRELAND

19

LIMITED; GOOGLE COMMERCE
LIMITED; GOOGLE ASIA PACIFIC

20

PTE. LIMITED; and ALPHABET

21

INC.,

22

Defendants.

Case No. ___21-cv-07250___

**COMPLAINT**

**WITH JURY TRIAL DEMAND**

23

24

25

26

27

28

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

PARTIES ............................................................................................ 5

JURISDICTION AND VENUE .......................................................... 9

INTRADISTRICT ASSIGNMENT ................................................... 10

FACTUAL ALLEGATIONS ............................................................. 10

I.   Background ............................................................................ 10

    A.   Digital Advertising and the Importance of Consumer Data .................... 11

    B.   Direct Advertising, Indirect Advertising, and Ad Intermediation ........... 12

    C.   Smartphones and Mobile App Distribution ............................................. 14

II.  The Unlockd Story ................................................................ 15

    A.   Unlockd Invents a New Mobile Advertising and Content Platform
       That Benefits Consumers, Advertisers, and Partners .............................. 15

    B.   Unlockd Launches Its First Major Commercial Partnerships with
       Telecommunications Companies Sprint and Tesco Mobile, with
       Google's Approval ................................................................................... 20

    C.   Unlockd Expands Its Business .................................................................. 23

    D.   Google Confirms Unlockd's Compliance with Google Policy ............... 25

    E.   Unlockd Further Grows Its Business, Increasingly Competes with
       Google, and Plans Its IPO ....................................................................... 27

    F.   Google Abruptly Backtracks on Its Previous Validation of Unlockd's
       Policy Compliance ................................................................................... 32

    G.   Unlockd Successfully Appeals Google's Policy Violation Report .......... 36

    H.   Unlockd Nears an Initial Public Offering ............................................... 37

    I.   Google Reverses Course Again and Wrongfully Eliminates Unlockd
       as a Competitor ....................................................................................... 38

    J.   Unlockd Is Forced To Shutter Its Business and Enter Insolvency
       Proceedings .............................................................................................. 43

i

K.   Having Eliminated Unlockd as a Competitor, Google Invests in and Partners with Another Company with a Similar Business Model ........... 46

III.   Google's Market Power in the Digital Advertising Market ............................... 48

A.   Product Market ....................................................................... 48

B.   Geographic Market ................................................................. 50

C.   Google's Dangerous Probability of Achieving Monopoly Power in the Digital Advertising Market ................................................ 50

IV.   Anticompetitive Conduct ......................................................................... 54

V.   Anticompetitive Effects ............................................................................ 55

VI.   Antitrust Injury ........................................................................................ 56

VII.   Effects on Domestic Commerce ............................................................... 58

COUNT 1:  Sherman Act § 2 ................................................................................. 62

PRAYER FOR RELIEF ........................................................................................ 63

JURY TRIAL DEMAND ...................................................................................... 63

GLOSSARY ........................................................................................................... 64

Plaintiff Unlockd Media, Inc. Liquidation Trust ("Plaintiff", and together with non-parties Unlockd Limited, Unlockd Media, Inc., Unlockd Operations U.S., Inc., and their subsidiaries, "Unlockd"), by its undersigned counsel, brings this action against Defendants Google LLC, Google Ireland Ltd, Google Commerce Ltd, Google Asia Pacific Pte Ltd, and Alphabet Inc. (collectively, "Defendants" or "Google") and allege, with knowledge with respect to their own acts and on information and belief as to other matters, as follows:

## INTRODUCTION

1.      Twenty years ago, Google touted itself as an idealistic startup that wanted to revolutionize the way people connect with information.  In Google's telling, it was on a mission to organize the world's online information to make it universally accessible and useful to anyone with an internet connection.  To generate revenue, Google would deliver relevant, cost-effective digital advertising that could be targeted based on individualized consumer data.  By leveraging data to connect the right ads with the right consumers at the right time, Google claimed, it could help advertisers to finely target their audiences in ways that were not available with traditional media.  In conducting business, Google committed to "make the world a better place" and adopted "don't be evil" as its official motto.

2.      Decades later, Google has become a giant in digital advertising.  Last year, its advertising revenue reached nearly $147 billion, comprising about 80% of the company's total revenue.  No other company comes close.  Google is no longer the idealistic startup it once claimed to be.  It has acquired monopoly power in multiple digital markets, in areas ranging from online search engines to mobile application ("app")[1] distribution, and it uses its monopoly power to strengthen its dominance and exclude its competitors, always keeping in mind its core profit driver:  digital advertising.  Google's history affirms the adage that absolute power corrupts absolutely.

---

[1] A glossary is available at the end of this Complaint.

3.     This particular case is about Google's abuse of its control over the Android smartphone ecosystem to drive an upstart competitor in the digital advertising market—Unlockd—out of business.  Google's plan worked perfectly.  By first allowing Unlockd to build its business in reliance on two crucial Google platforms—Google Play Store and Google AdMob—and then banning Unlockd from those same platforms once it got big enough to challenge Google in the digital advertising market, Google successfully eliminated Unlockd.  Unlockd was forced into bankruptcy as a direct result of Google's anticompetitive acts.

4.     Until its bankruptcy, Unlockd was a global technology startup with an innovative vision.  Unlockd identified an untapped "attention opportunity" immediately following the unlocking of a smartphone, a user's most engaged moment, and created a proprietary technology to monetize that opportunity in a way that rewards users for their attention.  Research showed that Android smartphone users unlock their devices 76 times per day on average, making monetization of the unlock screen an enormous opportunity.  With Unlockd's technology, users opted in to receive full-screen mobile ads or content upon unlocking their Android smartphones, and in exchange, they received virtual "points" that they could redeem for rewards such as mobile credit, subsidized streaming services, additional loyalty points, or in-app benefits like extra lives in mobile games.  Unlike Google—which keeps its advertising revenue for itself—Unlockd's business model included sharing its advertising revenue with its end-users.  Unlockd expected to pay users over $500 million in rewards by 2025.

5.     By identifying the unique attention opportunity presented when a phone is being unlocked, and by identifying users who explicitly agreed to accept advertisements when unlocking their phones, Unlockd was able to offer a valuable opportunity for advertisers, at the same time that it benefited users.  *First*, advertisers received first access to consumers at their most engaged moment, leading to significant improvements in user engagement compared to similar forms of advertising.  In effect, Unlockd had the best real estate in town.  *Second*, Unlockd was able to hyper-target its

advertising based on the large amounts of data voluntarily provided by its users—about 750 million daily data points, including the user's location each time they unlocked their phone.  This trove of data allowed Unlockd to match the right ads to the right consumers at the right time.  Together, these two features gave Unlockd a major advantage over existing forms of advertising, such as Google's search advertising.

6.     To distribute its apps to users and source advertisements to display, Unlockd relied on two critical Google services:  the Google Play Store and Google AdMob.  Unlockd relied on the Google Play Store, which Google describes as the "official" Android app store and accounts for over 90% of app downloads through Android app stores, for app distribution and upgrades.  Unlockd distributed all of its apps to users through the Google Play Store and could not realistically distribute its apps to users in any other way.  Unlockd relied on Google AdMob, which is Google's mobile advertising network, to connect Unlockd with advertisers who wanted to buy its ad space.  AdMob is by far the most dominant ad network in the world, especially in the United States and other predominantly English-speaking countries.  Google boasts that "81% of the Android top 1000 use AdMob" and that "97% of the AdAge 100 world's largest advertisers buy ads on AdMob."  Unlockd depended on AdMob to source advertisements to display to users when they unlock their phones.  Although Unlockd was building its own increasingly competitive advertising business that did not use an intermediary like AdMob—and intended to eventually build its own ad network that could replace AdMob—Unlockd had not yet achieved the scale necessary to completely cut out advertising intermediaries like Google.  AdMob sales therefore accounted for approximately 80% of Unlockd's revenue.

7.     In addition to being Google's customer, Unlockd also competed with Google in the digital advertising market.  Unlockd's innovative form of first-access, hyper-targeted advertising—which rewarded users and offered advertisers an impressive return on investment—was a threat to Google's own digital advertising business.  By rewarding users and delivering them ads only after they affirmatively opt in to receive

them, Unlockd posed a threat to Google's unrewarded, opt-out business model.  And by delivering ads to users right as they unlock their phones, Unlockd could reach users at their most engaged moment, before any other publisher, and therefore could offer advertisers highly attractive real estate compared to other publishers like Google. Combined with its powerful hyper-targeting capabilities, Unlockd's premium real estate and engaged user base provided exceptional value to advertisers.

8.     For most of its existence, Unlockd was small enough that Google did not perceive it as a threat.  That changed in the fall of 2017, when rumors started circulating that Unlockd was planning an initial public offering ("IPO") on the Australian Stock Exchange.  Soon after the press started reporting on Unlockd's upcoming IPO, Google informed Unlockd that Google would be terminating Unlockd's apps from the Google Play Store and AdMob due to alleged violations of Google Play and AdMob policy, even though Google had previously confirmed Unlockd's compliance with Google policy.  Unlockd explained why its apps were compliant and benefited all stakeholders, but Google gave Unlockd the run-around, was steadfast in its position, and refused all attempts to arrive at a mutually acceptable solution.  Google then unilaterally banned Unlockd from the Google Play Store and AdMob without just cause, cutting off these critical channels for Unlockd to distribute its apps to users and source advertisements to display to users when they unlock their phones.

9.     Without access to these two critical platforms, Unlockd was doomed. Without the Google Play Store, Unlockd could not realistically distribute its apps to users or ensure that users have up-to-date versions.  Without AdMob, Unlockd stood to lose its most important revenue source.  Thus, rather than complete a successful IPO, Unlockd's capital dried up, its partners severed their ties with the company, and the young company was ultimately forced into insolvency proceedings around the world, including in the United States.

10.     Although Unlockd immediately suspected anticompetitive motives on the part of Google, the full import of Google's anticompetitive conduct was only

recently revealed, after Google made a substantial strategic investment in another technology startup, "Glance", that operates in the same manner and in the same ad tech space that Unlockd did, delivering advertisements and sponsored content to Android smartphone users before or upon unlocking their devices.  Public reporting indicates that Google is now partnering with Glance to bring this business to the United States, where they will work with exactly the same types of companies that Unlockd had previously worked with, underscoring the pretextual nature of Google's objections to Unlockd's technology and business model.  By eliminating Unlockd from the scene, Google had positioned itself to invest in and partner with a company that does nearly the exact same thing as Unlockd, without Unlockd standing in the way.  So much for "don't be evil."

11.     Google's anticompetitive conduct violates federal antitrust law. Google has a dangerous probability of achieving monopoly power in the Digital Advertising Market, as defined herein, and excluded Unlockd from that market with the specific intent to destroy competition.  In banning Unlockd from the Google Play Store and AdMob, Google unilaterally terminated a voluntary and profitable course of dealing that had benefited both parties.  The only conceivable purpose for that sacrifice of short-term benefits was to obtain higher profits in the long run by excluding Unlockd as a competitor in the Digital Advertising Market.  Meanwhile, Google has continued to do business with similarly situated companies that pose a lesser competitive threat. Unlockd seeks damages for the injuries it suffered at Google's hand.

## **PARTIES**

12.     Plaintiff Unlockd Media, Inc. Liquidation Trust (the "Trust") is a New York trust established pursuant to the liquidation trust agreement dated August 4, 2021, entered into by and among Peter S. Kaufman and the bankruptcy estates of Unlockd Media, Inc. ("Unlockd Media") and Unlockd Operations U.S., Inc. ("Unlockd Operations"), authorized by the United States Bankruptcy Court for the Southern District of New York's Order Confirming the Fourth Amended Small Business Debtors' Combined Plan of Liquidation and Disclosure Statement (the "Plan") in *In re Unlockd*

*Media, Inc.*, Case No. 18-13243 (JLG) (Bankr. S.D.N.Y.).  Peter S. Kaufman is the trustee of the Trust, is the President of the investment bank Gordian Group LLC, and maintains his principal place of business in New York, New York.

13.     Non-party Unlockd Media is a Delaware corporation with its principal place of business in New York, New York.  Before filing for protection under Chapter 11 of the Bankruptcy Code, Unlockd Media was a wholly owned subsidiary of Unlockd Limited and carried out Unlockd's U.S. business, for example as the counterparty to telecommunications company Sprint/United Management Company ("Sprint") in Unlockd's contract with Sprint.  On October 26, 2018, Unlockd Media filed a petition for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

14.     Non-party Unlockd Operations is a Delaware corporation with its principal place of business in New York, New York.  Before filing for protection under Chapter 11 of the Bankruptcy Code, Unlockd Operations was a wholly owned subsidiary of Unlockd Limited and assisted in carrying out Unlockd's U.S. business, for example as party to the lease agreement for Unlockd's U.S. office space and to various other operations-related agreements.  On October 26, 2018, Unlockd Operations filed a petition for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

15.     On February 23, 2021, the United States Bankruptcy Court for the Southern District of New York confirmed the Plan and ordered that Unlockd Media and Unlockd Operations be substantively consolidated for all purposes.  On August 5, 2021, pursuant to the Plan, Unlockd Media and Unlockd Operations irrevocably transferred, assigned, and delivered all the assets of their estates, including but not limited to any and all claims they have on behalf of themselves and/or their affiliates against Google LLC and any of its parents and/or affiliates, to the Trust.

16.     Non-party Unlockd Limited is an Australian limited company with its principal place of business in Melbourne, Australia.  Before filing for protection

under Chapter 11 of the Bankruptcy Code in the United States, Unlockd Media and Unlockd Operations were wholly owned subsidiaries of Unlockd Limited.  Unlockd Limited was also the ultimate parent company to Unlockd's non-U.S. subsidiaries.  On June 12, 2018, Unlockd Limited entered "administration" in Australia, which is a reorganization-type insolvency proceeding similar to bankruptcy under Chapter 11 of the United States Bankruptcy Code.  Unlockd Limited's administration was subsequently converted into a liquidation, which is similar to bankruptcy under Chapter 7 of the United States Bankruptcy Code.  Unlockd Limited's liquidators agreed to assign to the Trust all claims against Defendants arising under the laws of the United States, the District of Columbia, or any U.S. state or territory owned by Unlockd Limited and/or its estate on behalf of itself and/or its affiliates.

17.     In this Complaint, Plaintiff uses the term "Unlockd" to include Unlockd Limited, Unlockd Media, Unlockd Operations, and/or Unlockd Limited's non-U.S. subsidiaries if the context so requires.  During all relevant times, Unlockd Limited and its subsidiaries acted as a single enterprise, with Unlockd Limited exercising continuing supervision, control, and intervention over and in its subsidiaries' affairs.

18.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.  Defendant Google LLC is a wholly owned and controlled subsidiary of XXVI Holding Inc., which is a wholly owned and controlled subsidiary of Defendant Alphabet.  Google LLC is the alter ego and agent of Defendant Alphabet, and the companies regularly combine and comingle their operations.  Google LLC was party to agreements governing distribution of the Boost Dealz app in the Google Play Store in the United States and governing Unlockd's use of AdMob in the United States.

19.     Defendant Google Ireland Ltd ("Google Ireland") is an Ireland limited company with its principal place of business in Dublin, Ireland.  Defendant Google Ireland is a wholly owned and controlled subsidiary of Defendant Google LLC. Google Ireland is the alter ego and agent of Defendants Google LLC and Alphabet, and

the companies regularly combine and comingle their operations.  Google Ireland was party to an agreement governing Unlockd's use of AdMob in the United Kingdom.

20.   Google Commerce Ltd ("Google Commerce") is an Ireland limited company with its principal place of business in Dublin, Ireland.  Defendant Google Commerce is a wholly owned and controlled subsidiary of Defendant Google LLC.  Google Commerce is the alter ego and agent of Defendants Google LLC and Alphabet, and the companies regularly combine and comingle their operations.  Google Commerce was party to an agreement governing Unlockd's use of the Google Play Store in the United Kingdom.

21.   Defendant Google Asia Pacific Pte Ltd ("Google Asia Pacific") is a Singapore private limited company with its principal place of business in Singapore.  Defendant Google Asia Pacific is a wholly owned and controlled subsidiary of Defendant Google LLC.  Google Asia Pacific is the alter ego and agent of Defendants Google LLC and Alphabet, and the companies regularly combine and comingle their operations.  Google Asia Pacific was party to agreements governing Unlockd's use of the Google Play Store and AdMob in Australia.

22.   Defendant Alphabet Inc. ("Alphabet") is a Delaware corporation with its principal place of business in Mountain View, California.  Defendant Alphabet wholly owns and controls Defendant Google LLC.  Defendant Alphabet is the alter ego of Defendant Google LLC.  Google LLC directs all profit to, and reports revenue through, Alphabet.  Defendant Alphabet is one of the top ten largest companies in the United States, with more than $162 billion in annual revenue.  Alphabet, ranking 15th in the list of Fortune 500 companies, is traded on the NASDAQ under the symbol "GOOGL".

23.   All Defendants are engaged in substantial interstate and/or foreign commerce.  Each Defendant deals with and earns revenue from publishers, advertisers, and/or mobile app developers throughout the United States and/or foreign nations.

1

## **JURISDICTION AND VENUE**

2        24.     This Court has subject-matter jurisdiction over Unlockd's federal

3   antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337.

4        25.     This Court has personal jurisdiction over each and every Defendant.

5   Google LLC and Alphabet are headquartered in this District.  All Defendants have

6   engaged in sufficient minimum contacts with the United States and have purposefully

7   availed themselves of the benefits and protections of United States and California law,

8   such that the exercise of jurisdiction over them would comport with due process

9   requirements.  Moreover, Google LLC, Google Ireland, Google Commerce, and Google

10  Asia Pacific have consented to the exercise of personal jurisdiction by this Court in the

11  Google Play Developer Distribution Agreement (the "DDA"), the Google AdSense

12  Online Terms of Service (the "AdSense TOS"), or both.

13        26.     Google LLC, Google Ireland, Google Commerce, and Google Asia

14  Pacific are parties to the DDA.  Section 16.8 of the DDA provides that the parties

15  "agree to submit to the exclusive jurisdiction of the federal or state courts located within

16  the county of Santa Clara, California to resolve any legal matter arising from or relating

17  to this Agreement or Your relationship with Google under this Agreement".

18  Section 16.8 further provides that "[a]ll claims arising out of or relating to this

19  Agreement or Your relationship with Google under this Agreement will be governed by

20  the laws of the State of California, excluding California's conflict of laws provisions."

21  The claims addressed in this Complaint relate to the DDA or to Unlockd and its

22  partners' relationship with Google under the DDA, or in the alternative such claims

23  arise out of the same nucleus of operative facts as other claims as to which the Court

24  may exercise personal jurisdiction over each Defendant, so that the exercise of pendent

25  personal jurisdiction would be proper.

26        27.     Google LLC is party to the AdSense TOS.  Section 15 of the

27  AdSense TOS provides that "[a]ll claims arising out of or relating to this Agreement or

28  the Services . . . will be litigated exclusively in the federal or state courts of Santa Clara

Complaint                                    9

County, and you and Google consent to personal jurisdiction in those courts."  Section 1 defines "Services" as Google's "search and advertising services".  Section 15 further provides that "[a]ll claims arising out of or relating to this Agreement or the Services will be governed by California law, excluding California's conflict of laws rules."  The claims addressed in this Complaint relate to the AdSense TOS or to the Services, or in the alternative such claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over each Defendant, so that the exercise of pendent personal jurisdiction would be proper.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Alphabet maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Unlockd's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue.  In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

29.     Defendants' acts were within the flow of, were intended to have, and did, in fact, have a substantial effect on the interstate commerce of the United States.

## INTRADISTRICT ASSIGNMENT

30.     Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a particular Division of this District, but shall be assigned on a District-wide basis.

## FACTUAL ALLEGATIONS

### I.     Background

31.     Before being bankrupted by Google, Unlockd had operated in the Digital Advertising Market, as defined herein, delivering digital advertisements to Android smartphone users in exchange for payments from advertisers.  To operate in

this market, Unlockd relied on Google as a supplier of distribution and intermediation services to distribute Unlockd's apps to users and source advertisements to serve to users when they unlocked their smartphones. Unlockd had a novel and exciting business model, was growing, and had a bright future. Then Google's anticompetitive behavior ended it all.

32.   To explain the Unlockd story, some background on digital advertising and the distribution of mobile apps is necessary.

**A.   Digital Advertising and the Importance of Consumer Data**

33.   Before the internet, companies who wanted to advertise did so largely through print, radio, and television. Advertisers who used such traditional media could do relatively little to target their audiences based on their traits and interests, however, as every reader, listener, or viewer of a particular publication was treated the same. At best, an advertiser could target its audience by choosing to advertise in certain publications based on generalized expectations about the publication's likely audience. Advertisers could not identify the particular consumer viewing the advertisement and tailor its advertising to that particular consumer.

34.   The internet changed all that. Today, billions of people around the world use the internet to do everything from shopping for clothes to watching movies to playing games to staying in touch with friends. Meanwhile, companies like Google can obtain data about specific consumers' behavior and use the information they collect to help advertisers target the right ads to the right consumers at the right time.

35.   Digital advertising is advertising delivered to consumers via the internet through their computers, smartphones, or other digital devices. Digital advertising formats enable advertisers to target their audiences by using information from the search term entered, by using consumer data to identify the likely characteristics of a viewer, or both—a key factor that distinguishes digital advertising from print and other traditional media advertising. The ability to hyper-target consumers gives digital advertising a unique role in the broader advertising landscape.

36.     In digital advertising markets, "publishers" (*e.g.*, website and mobile application owners) sell their advertising "inventory" (*e.g.*, space on websites or in apps) to advertisers.  Advertisers pay publishers for performance, usually based on the number of times a user views or clicks on the ad.

37.     For either performance metric, consumer data is critical to both the advertiser's ability to target its audiences and the publisher's ability to maximize its profits.  For inventory sold on a per-view basis, a view is more valuable to the advertiser when the advertiser has more information about the consumer viewing the ad.  The more data the advertiser has, the more the advertiser can target the consumers it wants to reach.  As a result, publishers with more consumer data to offer advertisers can charge more for their inventory.  Meanwhile, for inventory sold on a per-click basis, a publisher can sell more inventory when it can convert more user views into user clicks. Publishers have a finite amount of inventory to sell, so the more often a user clicks on an ad, the more the publisher gets paid.  The value of the publisher's inventory increases when the publisher has more consumer data to offer advertisers because more consumer data allows the publisher to increase the likelihood that the consumer clicks on the ad.

## B.     Direct Advertising, Indirect Advertising, and Ad Intermediation

38.     Publishers and advertisers can deal with each other directly or indirectly.

39.     In a "direct" deal, the publisher sells its inventory directly to the brand or advertising agency.  For example, an advertiser might contract directly with an online newspaper to put a banner ad on the newspaper's website, or an advertiser might contract directly with Google to place a search ad on Google's search engine.  In the early days of digital advertising, essentially all deals were direct.

40.     In an "indirect" deal, the publisher sells its inventory to the advertiser indirectly through an intermediary.  With the growth of the internet in the 1990s, direct digital advertising deals became cost prohibitive for smaller publishers, and even for many larger publishers with leftover (or "remnant") inventory.  To provide

a cost-efficient means of matching publishers with advertisers, intermediaries popped up to intermediate publishers' sales of inventory to advertisers.

41.     Important to this case is the intermediary who actually matches the publisher with the advertiser.  In general, there are two types of intermediaries that perform this function:  "ad networks" and "ad exchanges".

42.     Ad networks, which are the older of the two types of intermediaries, are analogous to broker-dealers in financial markets; they buy inventory from publishers and sell it to advertisers just like a broker-dealer might buy stock from one customer and sell it to another.  In intermediating these sales, the ad network takes a cut of the publisher's advertising revenue, similar to how a broker-dealer might take a commission or spread on an intermediated stock sale.  Today, ad networks are often used by smaller publishers.

43.     Ad exchanges perform a similar economic function to ad networks, but with somewhat different mechanics.  While both ad networks and ad exchanges intermediate sales of advertising inventory, ad exchanges are auction-like platforms where advertisers bid to place advertisements with publishers, similar to stock exchanges in financial markets.  Ad exchanges frequently cater to larger publishers.

44.     In the mobile app world, a specialized set of ad networks and exchanges are available to help publishers to source demand for mobile app advertising inventory.  Google is the dominant player in this space, especially in the United States, the United Kingdom, and Australia.  The most dominant mobile ad network is Google's AdMob, while the most dominant mobile ad exchange is Google's Ad Exchange, formerly called "AdX".  One public data source indicates that AdMob is installed in 90% of Android apps that use ad network software development kits, making it the most popular installed ad network software development kit across Android apps worldwide, while another source indicates that AdMob is present in 54% of Android apps and 52% of installations on Android devices.  Meanwhile, Google boasts that "81% of the

Android top 1000 use AdMob" and that "97% of the AdAge 100 world's largest advertisers buy ads on AdMob."

### C.   Smartphones and Mobile App Distribution

45.   The rise of smartphones created even more opportunities for targeted digital advertising.  Smartphones are handheld, portable electronic devices that can connect wirelessly to the internet and are capable of multi-purpose computing functions, including, among other things, browsing the internet, using social media, streaming video, listening to music, or playing games.  Users access these functions through mobile apps installed on their smartphones.  Although some app developers charge users for buying the app or charge an ongoing subscription fee, many apps are free and instead generate money through sales of their ad space to advertisers, often indirectly via Google AdMob.

46.   Like laptop and desktop personal computers, smartphones require an operating system or "OS" that enables multi-purpose computing functionality.  Mobile apps are specific to a particular OS, such that an app that works with one OS will not work with another OS.  For example, an app that works on smartphones using Apple's iOS (*i.e.*, iPhones) will not work on smartphones that instead use the Android OS, and vice versa.

47.   The Android OS, which Google develops and controls, is by far the most popular mobile OS in the world.  As of December 2017, the Android OS was used on approximately 73.5% of smartphones globally, while Apple's iOS was used on approximately 19.9% of devices and other OSs were used on approximately 6.6% of devices.

48.   Although smartphone manufacturers sometimes pre-install apps, consumers usually want to obtain and install new mobile apps after purchasing their device.  Currently, on Android devices, this is done most often through the Google Play Store, Google's "app store".  The Google Play Store is a digital portal through which consumers can browse, search for, purchase (if necessary), and download apps.  The

Google Play Store is by far the dominant app store, accounting for over 90% of app downloads through Android app stores.  Indeed, Google advertises the Google Play Store as the "official" Android app store.

49.     Although users can nominally download apps for their Android smartphones directly and through other app stores, Google has leveraged its control over the Android OS to make doing so unfeasible in practice.  For example, Google ensures that the direct downloading process is technically complex, confusing, and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process.  Moreover, as if this slog through warnings and threats were not enough to ensure the inferiority of direct downloading as a distribution method for Android apps, Google denies downloaded apps the permissions necessary to be seamlessly updated in the background—instead allowing such updates only for apps downloaded via the Google Play Store.  The result is that consumers must manually approve every update of a directly downloaded app.  Google has used its control of the Android OS to disadvantage other competing apps stores in similar and additional ways, such as by imposing similar security warnings, by similarly prohibiting automatic updating of apps downloaded through competing app stores, and by imposing contractual restrictions on smartphone manufacturers that give preferential treatment to the Google Play Store.

50.     These Google-imposed restrictions help to ensure that app developers who make apps for the Android OS must as a practical matter rely on the Google Play Store to distribute their apps to Android users.

## II.    The Unlockd Story

### A.    Unlockd Invents a New Mobile Advertising and Content Platform That Benefits Consumers, Advertisers, and Partners

51.     Matt Berriman, Craig Watt, and Chris Kerrisk cofounded Unlockd in Australia in June 2014.  They saw an opportunity to create value for all stakeholders in the mobile advertising ecosystem, including consumers themselves.

52.     Unlockd set out to create an attention-based mobile rewards platform centered around the "unlocking" of an Android smartphone.  To keep their smartphones

Complaint                                          15

secure, Android users often set up a security feature such as facial recognition or a numeric passcode that must be entered before the user can access their device.  Upon "unlocking" their phones, users ordinarily go straight to the "home screen", where they can open any number of different apps, but Unlockd's founders saw that as a missed opportunity.  Users are their most engaged with their devices when they first access them, which was an opportunity to create value for both users and companies that want to reach them.

53.     With that attention opportunity in mind, Unlockd developed a technology platform that would be a "win-win-win" for users, advertisers, and partners alike.  Users would opt in to receive full-screen mobile ads or content when they unlock their Android smartphones, and in exchange, they would receive a reward such as a mobile credit, loyalty points, or subsidized streaming services.  Advertisers would get first access to users when they unlock their Android devices—a user's most engaged moment.  Partners would get improved customer acquisition, retention, and engagement, as well as a share of the advertising revenue.  The following diagram, from Unlockd's draft IPO prospectus, explains the basic system:



54.     Unlockd developed its technology for use with Google's Android OS, which had the biggest base of addressable users worldwide.

55.     Unlockd's technology was innovative in several ways.  To start, unlike most digital advertising, users had to affirmatively opt in to be served ads, and they received rewards in return for doing so.  This user-first, opt-in model was a stark contrast to the more traditional business models of established players like Google, who make it difficult or impossible for users to opt-out of seeing ads and do not compensate users for agreeing to view ads.  Unlockd shared the majority of its advertising revenue with users in the form of rewards, while Google generally does not pass along any advertising revenue to users.  The possibility that Unlockd's user-first, opt-in business model might become more popular created massive risks for Google, which could lose market share to publishers like Unlockd if consumers started expecting to be rewarded for agreeing to view ads.

56.     Aside from its opt-in, rewarded nature, Unlockd's platform was also unique because it reached users at the perfect time.  Most mobile ads are delivered to users inside apps that users access from the home screen.  Unlockd observed that users often find such ads annoying because the ads interrupt whatever the user is doing in the app, such as listening to music, watching a video, or playing a game.  By delivering ads at the unlock event instead, Unlockd would catch users at a better time—before they become engaged in an app or other activity.  This produced benefits not only for users, but also for advertisers.  Because users are more engaged when they unlock their phones, advertisers would get more of the consumer attention they desire and therefore earn a better return on investment.  The following diagram, also from Unlockd's draft IPO prospectus, depicts the benefits of this first-access advertising model:

57.     Finally, Unlockd provided a powerful customer acquisition and retention tool to Unlockd's partners.  Instead of marketing its products directly to consumers, Unlockd partnered with other companies that already have their own customer bases, starting with wireless carriers like Sprint.  Although details would vary from deal to deal, the basic arrangement required Unlockd to provide the technology and run the ad operations, while the partner would recruit its customers to opt in to the Unlockd platform.  In return for agreeing to view ads upon unlocking their smartphones, the customer would receive a discount on the partner's product, such as mobile credit or data in the case of a wireless carrier.  The ability to offer these discounts allowed partners to acquire and keep more customers by offering their products to consumers for less money.

58.     The "win-win-win" nature of Unlockd's business model is depicted in the following diagram from Unlockd's draft IPO prospectus:

59.     To turn this concept into reality, Unlockd started raising capital, developing software to implement its technology, and negotiating potential partnerships. Between June and November 2014, Unlockd raised approximately $725,000 AUD in seed capital, which the company used to apply for patent protection of its proprietary technology.  Between March and October 2015, Unlockd raised approximately $8.25 million AUD in Series A capital, based on an implied pre-money valuation[2] of approximately $35 million AUD, which the company used to further develop its technology and expand its business.

60.     In October 2015, Unlockd launched its first beta test in Australia. This beta test, in partnership with telecommunications company Lebara Mobile, featured a "white-label" app,[3] developed by Unlockd and customized with Lebara's branding, that Lebara's customers could download from the Google Play Store.  After downloading the app and agreeing to view ads upon unlocking their phones, users

---

[2] A pre-money valuation refers to a company's valuation before an investment has been made.  Unlockd's Series A pre-money valuation is based on shares issued in October 2015.

[3] A white-label app is an app built by an app developer to be rebranded with another company's branding.

Complaint                                    19

1    would get discounts on their phone bills with Lebara.  Google allowed the Lebara app to

2    be distributed through the Google Play Store starting in October 2015.

3                 61.     This beta test was successful, and Unlockd's first major commercial

4    partnerships soon followed.

**B.    Unlockd Launches Its First Major Commercial Partnerships with Telecommunications Companies Sprint and Tesco Mobile, with Google's Approval**

7                 62.     In the fall of 2015, Unlockd inked a deal with U.S. telecom company

8    Sprint to launch Unlockd's first commercial product in the United States, the "Boost

9    Dealz" app.  Similar to the Lebara app, Unlockd would provide a white-label app,

10   customized with Sprint's branding, for customers of Sprint's "Boost Mobile" brand.  In

11   its agreement with Sprint, Unlockd agreed to provide the app and run the ad operations,

12   while Sprint would recruit its Boost Mobile customers to use the app.  After

13   downloading the app, users would agree to view ads upon unlocking their Android

14   smartphones.  In return, they would receive points that they could redeem for mobile

15   credit or data with Boost Mobile.  To earn the maximum points, users would simply

16   have to view at least one ad per day—that is, unlock their phone just once in a single

17   day—for 20 days out of a 30-day period.  Given how frequently Android users normally

18   unlock their phones—about 76 times per day on average—this would ensure that users

19   could earn the maximum points just by using their phones as they normally would.  The

20   parties planned to launch the app in late January 2016.

21               63.     Unlockd and Sprint both recognized that the Google Play Store

22   would be a critical channel for distributing the app to users.  Google unilaterally sets

23   and maintains policies relating to the Google Play Store, which Google requires

24   developers who distribute their apps through the Google Play Store to comply with, so it

25   is important for developers to get Google's approval of their apps.  Unlockd was careful

26   to submit the app to Google for review well ahead of the planned launch.  On January 6,

27   2016, Google reviewed and approved the Boost Dealz app, allowing Unlockd to

28   proceed with the launch.

64.     On January 26, 2016, the Boost Dealz app went live, and users loved it.  Unlockd's innovative form of advertising proved far less intrusive than other types of advertising, such as unwanted popups or full-screen ads that interrupt the user in the middle of a game, because users viewed ads only after giving permission to be served them and could easily exit out of them by tapping an obvious "X" on the screen.  And, of course, they received significant rewards, with Boost Dealz users ultimately receiving ████████.  Appreciating this value proposition, users gave the app glowing reviews, with an average rating of 4.1 out of 5 stars in the Google Play Store.  One user wrote:  "I've been using it for two months and have received the $5 credit each 30 days . . . .  I'm getting unlimited talk/text and 2GB data for $25 on the Sprint LTE network . . . I left T-Mobile for this and haven't looked back."  In total, users downloaded the app from the Google Play Store more than 1 million times by early 2018.

65.     The Boost Dealz app was also extremely effective for advertisers. One common metric used to evaluate the effectiveness of an advertisement is the ad's click-through rate ("CTR"), which measures the percentage of times a user who views the ad clicks on it.  High CTRs indicate that users are engaged with the ads they are viewing.  Unlockd's ads boasted CTRs that were substantially higher than the industry average, showing that users were engaging more with Unlockd's ads than with other ads.  Indeed, Unlockd's CTRs even exceeded those of Google's own search advertising.[4]  And, importantly, users were clicking on ads out of genuine interest, not because of any sort of reward—users earned rewards regardless of whether they clicked on an ad.  Nor could users game the system by repeatedly *viewing* ads.  As previously noted, users would maximize their points by unlocking their phone just once per day for 20 days out of a 30-day period.  Given that Android smartphone users unlock their phones on average 76 times per day, this ensured that users were not incentivized to

---

[4] For example, the direct and indirect CTRs for the Boost Dealz app were respectively approximately █% and ██% for the fourth quarter of 2017, ██% and ██% for the first quarter of 2018, and ██% and █% for the second quarter of 2018.  By contrast, one online source reports that the average CTR across all publishers in Google Ads was approximately 1.9% for the search network and 0.4% for the display network.

unlock their phones just to get rewards.  Advertisers recognized this value.  For example, the ███████████████████████████████████████ ██████████ commented:  "Unlockd has been a great partner, collaborating with us to identify the best ways to reach our future customers.  We're seeing real value from the partnership and look forward to more success in the future."

66.     Finally, the Boost Dealz app was great for Sprint.  Under the parties' arrangement, Unlockd was responsible for providing the app and running all the advertising operations, while Sprint was responsible for recruiting its customers to download the app.  Unlockd shared a portion of the advertising revenue with Sprint. The key benefit to Sprint, however, was improved customer acquisition and retention— the app helped Sprint to acquire new Boost Mobile customers and retain existing ones.

███████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████.  In the words of Boost Mobile's Director of Prepaid Product Marketing:  "Boost Dealz, built on the Unlockd solution, is an industry first, completely optional opportunity for our customers to earn value . . . . [I]t delivers a new revenue stream to our business while providing an innovative avenue for advertisers and media publishers to reach a highly targeted audience."

67.     In June 2016, while raising another $8.3 million AUD in capital, Unlockd expanded to the United Kingdom, launching the "Tesco Mobile Xtras" app in partnership with U.K. telecommunications company Tesco Mobile.  The Tesco Mobile Xtras app worked similarly to the Boost Dealz app, providing Tesco Mobile customers who installed the app with the opportunity to earn mobile credit or data in exchange for viewing ads upon unlocking their phones.  Like the Boost Dealz app, Google allowed the Tesco Mobile Xtras app to be distributed through the Google Play Store.

68.     Like the Boost Dealz app, the Tesco Mobile Xtras app was highly successful.  In the words of Tesco Mobile's CEO:  "Tesco Mobile Xtras, powered by Unlockd's unique platform, provides our customers with even more choice and value.  The opportunity for our customers to save money on their phone bill in exchange for learning about products and services relevant to them is a first in the UK market and we're excited to exclusively offer this value to our customers."

69.     Meanwhile, Unlockd also started experimenting with delivering other types of content to users on the unlock screen.  By expanding the content delivered to users beyond ads, Unlockd could both give users more variety and provide a new channel for content publishers to reach readers.  For example, in late 2016, Unlockd worked with News Corp subsidiary News UK to deliver News UK content to users of the Tesco Mobile Xtras app in the United Kingdom.  In addition to ads, Tesco Mobile Xtras users could see news articles from publications such as *The Sun* and *The Times* when they unlocked their phones.

70.     During this period, Unlockd started using Google's mobile ad network, AdMob.  Unlockd integrated AdMob into the Boost Dealz and Tesco Mobile Xtras apps in November 2016, and it soon became a vital source of advertisements for Unlockd.  In exchange for providing these intermediation services, Google took a cut of the advertising revenue.  As with the Google Play Store, Google unilaterally sets and maintains policies relating to AdMob, which Google requires publishers who use AdMob to comply with.  Google allowed Unlockd to use AdMob for the Boost Dealz and Tesco Mobile Xtras apps without raising policy issues for either app.

### C.     Unlockd Expands Its Business

71.     Building on its success in the telecommunications space, Unlockd started expanding its business to bring its innovative technology to other market segments, such as content-streaming and gaming companies.

72.     In March 2017, Unlockd partnered with global entertainment company MTV to launch its first streaming solution, providing users with free premium

access to MTV's "MTV Trax" app in the United Kingdom.  Before Unlockd, streaming companies had typically offered users either a premium, subscription-based payment model without ads or an ad-based model where users have to endure ads between songs or videos.  In partnering with Unlockd, MTV was able to offer its users a premium, uninterrupted listening experience without any subscription fees.  Using the Unlockd feature, users could get this uninterrupted listening experience for free by opting in to view ads upon unlocking their phones, similar to Unlockd's other apps.  To opt into this payment model, which was integrated directly into the MTV Trax app, users would simply select Unlockd as the "method of payment".

73.    Given the strength of the MTV brand—and in light of Unlockd's success for MTV Trax—the MTV partnership helped Unlockd to validate the effectiveness of Unlockd's technology for content-streaming companies.  With the successful MTV partnership as part of its sales pitch, Unlockd began engaging other potential streaming partners in both audio and video, such as █████████████ ████████████████████████████, and others.

74.    As Unlockd's cofounder and CEO, Mr. Berriman, explained in a March 2017 presentation to stakeholders, the new partnership with MTV was only the beginning.  While Unlockd had initially sought to offer consumers another way to pay *for* their phone service, Unlockd would now create new ways for consumers to pay *with* their devices.  This would allow Unlockd to move into a wide range of new market segments, including content streaming, loyalty programs, gaming, gas, groceries, general retail, and more.  Instead of paying for these products and services with cash, consumers could pay with points earned using the Unlockd platform.  By offering an innovative, ad-funded payment model, Unlockd ultimately hoped to create the world's largest ad- and content-driven virtual currency, returning $500 million in rewards to the community by 2025.  In Mr. Berriman's words, Unlockd would seek to "forever change the way people use and pay with their digital devices."

75. To that end, Unlockd also started discussing potential partnerships with gaming companies, hoping to expand Unlockd's business so that the Unlockd platform could fund digital games.

76. To support its further expansion, Unlockd again went to investors for additional funds, raising $26.5 million AUD in Series B capital between May and August 2017, based on an implied pre-money valuation of approximately $126 million AUD.[5]

**D.    Google Confirms Unlockd's Compliance with Google Policy**

77. As of April 2017, Unlockd had been using AdMob for approximately five months without any allegation by Google that Unlockd's apps violated AdMob policy. Then, on April 18, 2017, a member of the AdMob team, Maryna Ilina, emailed Unlockd suggesting a 30-minute call or virtual meeting in which they "could brainstorm together [a] few ideas on future revenue growth strategies and ad units placement improvement in order to comply with Google policy". The next day, Unlockd representatives met virtually with Ms. Ilina to discuss Unlockd's apps and their functionality, and Ms. Ilina followed up by email with additional information regarding Google's policies, including the policies that "ads can only be shown in the app environment" and that "the app doesn't encourage users to click on ads". Ms. Ilina also asked for Unlockd's Android application package, which is the software package that contains the program's code, so that Google's policy team could install Unlockd's apps and make sure they do not violate AdMob policy.

78. Unlockd sent Ms. Ilina the latest version of the Boost Dealz app so that Google could review the app for policy compliance. Ms. Ilina confirmed over email that Google "will review the app with our Policy team and product managers teams and I'll get back to you with an update on both policy recommendations and [another unrelated issue]."

---

[5] Unlockd's Series B pre-money valuation is based on shares issued in May 2017.

79.     Unlockd met with Google in person on June 21, 2017, at Google's "App Summit" in Dublin, Ireland.  In a meeting with Ms. Ilina and three other Google representatives, including Google's Mobile Apps Business Leader for Europe, the Middle East, and Africa, Unlockd explained in detail how its apps worked.  Unlockd emphasized that users would receive ads only if they opted in, and that users understand the value exchange that occurs on the platform.  Google's representatives were satisfied with Unlockd's explanations and said they did not see any problems with Unlockd's business model, representing to Unlockd that its apps did not violate Google policy.  As Unlockd's Global Head of Programmatic & Ad Operations explained in a subsequent email summarizing the meeting, Google "consistently reassured [Unlockd] that the way we run ads is not in violation of policy".  In another email summarizing the meeting, the same individual explained:  "We are not in violation of Google's policy as we stand.  They class us as an 'App Open Interstitial' and there isn't anything wrong with what we are doing – I had this validated by their product leads."  Apparently enthusiastic about Unlockd's product offerings, Google also pitched Unlockd to use Google's ad exchange, then called AdX (now called Google Ad Manager), which is a selective, invite-only intermediation service.

80.     On July 19, 2017, after receiving additional information from Unlockd, Ms. Ilina confirmed over email "that we have validated everything internally and a team of DFP/AdX apps specialists is assigned to work with you."  Ms. Ilina also enclosed draft terms and conditions for AdX and invited Unlockd to open an AdX account after signing them.  In other words, Google not only confirmed Unlockd's compliance with Google policy, but also actively sought to persuade and then approved Unlockd to use Google's premium intermediation service, AdX, which (unlike AdMob) is not widely available to all app developers.  The following month, Unlockd signed a deal with Google for use of AdX.

81.     Therefore, as of July 2017, Google had expressly approved Unlockd for both the Google Play Store and AdMob.  Google allowed Unlockd's apps to be

distributed through the Google Play Store starting in October 2015 and reviewed and approved the Boost Dealz app for the Google Play Store in January 2016.  Meanwhile, Google allowed Unlockd to use AdMob starting in November 2016 and approved Unlockd's apps for compliance with AdMob policy in June 2017.

### E. Unlockd Further Grows Its Business, Increasingly Competes with Google, and Plans Its IPO

82.    In reliance on Google's repeated confirmations that Unlockd was operating in compliance with Google policy, Unlockd continued to grow its business and started planning for an IPO.

83.    In August 2017, in partnership with the operator of the Australian loyalty program Flybuys, Unlockd launched its first loyalty rewards app, branded as "Unlock Rewards", as part of the company's entry into the loyalty market segment. Like Unlockd's other partnerships, users agreed to view full-screen ads upon unlocking their Android devices.  In exchange, users earned loyalty points, which they could then redeem for benefits.  These loyalty points functioned as a type of virtual currency that consumers could use to buy other products or services.  Google allowed the Unlock Rewards app to be distributed through the Google Play Store starting August 20, 2017.

84.     Unlockd also introduced a new product feature, the "Earn Wall", and allowed users to obtain additional rewards through third-party offers.  Implemented within the Boost Dealz app in November 2017, the Earn Wall allowed users to earn additional points by (i) viewing ads upon unlocking their phones or (ii) by completing tasks through the Earn Wall.  They could then redeem these points to obtain benefits with Unlockd's partners (such as mobile credit or data with Sprint) or special deals with third parties.  The following diagram depicts the basic idea:



85.     The Earn Wall was another win-win-win for users, advertisers, and partners.  Instead of scrolling through social media or playing a game while waiting in line or commuting to work, users could monetize their attention to receive additional benefits beyond what they could obtain purely by viewing unlock-screen ads.  For example, Boost Dealz users could earn up to $20 per month in mobile credit and redeem up to $30 per month in third-party offers, for a total of up to $50 per month in value.  Meanwhile, advertisers and third parties received a unique channel through which to reach and receive insights about consumers, such as through surveys offered on the Earn Wall platform.  Partners received additional advertising revenue and improved customer acquisition, retention, and engagement.

86.     Building on the new feature's success for the Boost Dealz app, Unlockd implemented the Earn Wall in the Tesco Mobile Xtras and Unlock Rewards apps as well.

87.     Reflecting the attractiveness of Unlockd's product, Unlockd continued to build its streaming and telecom businesses, signing deals and launching partnerships with several companies.  In the streaming area, Unlockd made deals to launch music streaming partnerships with █████████████████████ █████████████████████████████████████████ entered a letter of intent to launch a multi-territory video streaming deal with multinational streaming company ████; and entered advanced discussions about video streaming deals with multinational entertainment companies including █████████████████ ████.  In the telecommunications space, Unlockd launched partnerships with telecommunications companies Axiata, Aircel, and ████████████; and signed deals for future launches with █████████████████████████████████ ████.

88.     Unlockd also took concrete steps to enter the gaming space.  By the fall of 2017, Unlockd had initiated discussions with a number of different gaming companies, such as American video game company ███████, whose CEO was excited about the prospect of working with Unlockd.  To jumpstart its gaming business, Unlockd hired two business development executives, respectively based in New York and California, who specialized in gaming.  By the spring of 2018, Unlockd had deals to launch partnerships in the United States with gaming companies ██████████, █████████████████, with target launch dates starting in mid-2018, and was close to striking a deal with several other gaming companies.

89.     Unlockd's entry into the gaming business had the potential to disrupt the way people pay for games with their digital devices.  Before Unlockd, game developers usually made money by offering subscriptions, selling in-game benefits like extra lives or better equipment, or in-app advertising.  Unlockd recognized the

drawbacks of each of these monetization models—users tend to prefer not giving over their hard-earned cash for a subscription or in-game benefits if they can avoid it, and in-app advertising interrupts the user experience.  Similar to its streaming business, Unlockd intended to provide gamers and developers with an alternative to these existing models:  an uninterrupted gaming experience with no monthly subscription fees, funded by advertisements served on the unlock screen.

90.    Unlockd also continued to expand its direct advertising business, building a sales presence in New York, London, Melbourne, and Delhi, and working with well-known brands such as ███████████████████████.  Unlockd's direct advertising business used innovative, hyper-targeted advertising to match the right users with the right ads at the right time.  To optimize this targeting function, Unlockd, with the consent of users who opted into its apps, collected approximately 750 million user data points per day, including users' locations whenever they unlocked their phones.  By gathering detailed data about its users, Unlockd was able to finely target the ads it served based on the user's stated interests based on numerous different data points, including the user's location, the appropriate time of day given the user's typical day, and the types of ads and content the user is most likely to respond to based on previous experience.  The following diagrams depict the data collection and analysis capability that Unlockd was building:





91.     Unlockd's direct advertising campaigns were highly effective for advertisers.  Quarterly average direct CTRs for the Boost Dealz app ranged from

██████████████████████████████████████████████

████████████, both of which significantly exceeded industry average CTRs for mobile display ads and average CTRs for Google's own search ads—1.9%, according to an online source.

92.     Moreover, these direct campaigns were highly effective in getting consumers to buy the advertiser's products.  For example, a campaign with ████ ████████████ and Australian supermarket chain ████ achieved a ████% CTR and a ████ *% conversion-to-customer* rate.  That is, ████% of all users who unlocked a ████████ ad clicked the ad, and ████% of all users who unlocked a ████ ad *bought* a ████████ product.  This highly successful campaign was possible because Unlockd could identify customers who were likely to buy ████████ product and then serve them with an ad for it when they unlocked their phone near a ████████ supermarket, taking advantage of finely tuned geotargeting.

93.     Unlockd's hyper-targeted advertising capability was a direct challenge to Google's digital advertising business, which relies on troves of individualized consumer data to attract advertisers with the promise of hyper-targeted advertising.  This threat was likely to grow significantly as Unlockd was gaining scale.

94.     Unlockd's business model also challenged Google's digital advertising business because Unlockd relied on an *opt-in* model and compensated users for their attention, whereas Google relies on an *opt-out* model and does not pay users for agreeing to view ads or giving their personal data to Google.

95.     In the fall of 2017, building on these early successes, Unlockd began planning for an IPO on the Australian Stock Exchange.

**F.     Google Abruptly Backtracks on Its Previous Validation of Unlockd's Policy Compliance**

96.     For nearly two years after Unlockd first started distributing its apps through the Google Play Store and nearly one year after Unlockd started using AdMob, Google allowed Unlockd to build its business without alleging that any of its apps violated Google policy.  In fact, Google specifically approved Unlockd's apps for compliance with Google policy in January 2016 for the Google Play Store and June 2017 for AdMob.  Unlockd's apps continued to operate in the same manner in which they were approved.

97.     That all changed on September 20, 2017.  On that day, without any warning, Google unilaterally disabled AdMob ad serving for Unlockd's Australian app (Unlock Rewards, in partnership with Flybuys).  Despite having previously validated Unlockd's compliance with AdMob policy, Google sent an email from a "no reply" email address informing Unlockd that Google had disabled ad serving for the Unlock Rewards app based on a purported violation of the "Incentivized Traffic" policy.  The email stated that "AdMob publishers are not permitted to place AdMob ads on applications with content related to programs offering incentives to click links or ads, read emails, or visit other applications or websites.  This would include, for instance, auto-surf apps, pay-to-read email networks, and apps comparing various pay-to-click programs."

98.     Google did not explain, and Unlockd did not understand, how the Unlock Rewards app could violate this policy.  The policy purported to prohibit offering "incentives to click links or ads", but Unlockd's apps offered no such incentives.  To the contrary, users received nothing in exchange for clicking on ads, and users could easily exit out of an ad by tapping an obvious "X" on the screen, thereby safeguarding against erroneous clicks.

99.     Given that Google had represented just two months earlier that Unlockd's apps complied with Google policy—including the same policy that Google was now alleging that Unlockd was violating—Unlockd assumed that the shutoff was a mistake and reached out to its AdMob account manager, Ms. Ilina, to get the app reenabled.  Ms. Ilina told Unlockd that she would look into the issue with the policy team and get back to Unlockd.

100.    The next day, however, Ms. Ilina wrote back informing Unlockd that "it won't be possible to re-enable ad serving on your Australian account at this stage, but we will do our best to help you build a more compliant business model."

101.    Following these emails, Unlockd attempted to engage in a dialogue with Google, but on September 26, 2017, Google emailed Unlockd a formal "AdMob

Publisher Policy Violation Report" (the "September 2017 Email") alleging violations of three policies: (i) "Pages That Offer Compensation Programs"; (ii) "Valuable Inventory"; and (iii) "Disallowed Interstitial Implementation".

102.   The "Pages That Offer Compensation Programs" policy was essentially a variant of the Incentivized Traffic policy. Google offered a two-sentence explanation for its conclusion that Unlockd's apps violated this policy: "Users are currently incentivized to view ads each time they unlock their phones. Placing Google ads on these pages may result in invalid impressions or clicks and is therefore prohibited."

103.   The alleged violations of the "Valuable Inventory" and "Disallowed Interstitial Implementation" policies were new. Again, Google offered two-sentence explanations for its conclusions that Unlockd's apps violated these policies. As to the Valuable Inventory policy, Google claimed: "At present there is no content for the user other than viewing ads and receiving rewards. Our policies require that apps have more original content than ads in order to monetize." As to the Disallowed Interstitial Implementation policy, Google claimed: "Ads can't be placed in applications that are running outside of the app environment. Every time the user unlocks their screen it triggers an ad outside the app."

104.   The September 2017 Email also informed Unlockd that, starting October 20, 2017, AdMob ad serving would be disabled for the Boost Dealz and Tesco Mobile Xtras apps as well.

105.   Unlockd attempted to explain to Google that its apps did not violate the letter or the spirit of Google's policies. As to the Pages That Offer Compensation Programs policy, Unlockd tried to explain that its apps did not violate this policy because they did not incentivize users to click or view ads. Users did not receive any compensation for clicking ads, and the way users earned points for viewing ads ensured that users were not incentivized to view ads in order to earn points. Users reached the maximum amount of rewards by unlocking their phone just *once per day*, which

1   prevented users from gaming the system by repeatedly unlocking their phones.  Given

2   how frequently Android smartphone users already unlocked their phones—on average

3   76 times per day—users would reach the maximum rewards level simply by interacting

4   with their smartphones in the ordinary course, as they otherwise would.  Unlockd

5   therefore rewarded users for *opting in*, not for viewing individual ads.  If anything,

6   Unlockd's apps *reduced* the incidence of accidental clicks compared to other ads

7   because, unlike unexpected pop-up ads that users did not sign up to receive, Unlockd's

8   users affirmatively opted into receiving ads on the unlock screen and therefore knew

9   what was coming.

10          106.   Unlockd also tried to explain that its apps did not violate the spirit of

11  the Valuable Inventory policy, which Google has stated is designed to protect

12  advertisers by ensuring high-quality ("valuable") inventory.  Unlockd's inventory was

13  highly valuable to advertisers because ads delivered through the Unlockd platform

14  reached consumers at their most engaged moment—when they unlock their phones.

15  This value is evident from Unlockd's high CTRs, which were substantially higher than

16  industry standards.  The rationale cited by Google—that Unlockd's advertising

17  purportedly exceeds its other content—is inapplicable to an app like Unlockd's, whose

18  value proposition for advertisers has nothing to do with providing "content" to users and

19  instead is based on reaching users at their most engaged moment.  Moreover, in pitching

20  "rewarded ads" available through AdMob, Google has admitted that advertisers value

21  rewarding users for their engagement.  Describing rewarded ads as "[a] win for

22  advertisers", Google has claimed that "rewarded ads create valuable impressions."

23  Google explains that "[a]dvertisers love rewarded ads because they receive higher user

24  engagement than other ad formats, resulting in higher return on ad spend".

25          107.   Finally, Unlockd attempted to explain that its apps did not violate the

26  Disallowed Interstitial Implementation policy by serving ads "outside of the app

27  environment".  For Unlockd, the unlock screen *was* the app environment.  In any event,

28  the rationale for this policy—protection of users and advertisers—does not apply in this

context, as users affirmatively opted into receiving ads, and the effectiveness of advertising on Unlockd's platform from the advertiser's perspective was proven.

108.   Unlockd tried to engage with Google on these issues, requesting an in-person meeting with a member of the policy team to discuss them.  But Google refused to discuss the issues, even over the phone.  In response to Unlockd's requests for further dialogue, Ms. Ilina stated that "[t]he Policy team cannot reinstate the Australian app as stated in the sent email", and "[i]n the email they shared in detail why your apps weren't compliant with policies and unfortunately there's nothing more they could add here."

109.   Meanwhile, the shutoff of AdMob for the Unlock Rewards app was gutting Unlockd's advertising revenue.  Between September 1, 2017 and September 19, 2017, before the shutoff, the Unlock Rewards app had an average gross average revenue per user ("ARPU") of $███, with a daily average of $███.  Shortly after AdMob cut off the services, the average gross ARPU plummeted to $███, with a daily average of $███.  That is, the daily average gross ARPU dropped ██% as a result of the AdMob shutoff.

### G.     Unlockd Successfully Appeals Google's Policy Violation Report

110.   With Google refusing to engage in dialogue with Unlockd about the alleged policy violations, Unlockd was left with no choice but to file a formal appeal through Google's online appeal portal.

111.   On October 20, 2017, Unlockd filed a formal appeal on the Google website (the "October 2017 Appeal").  In its submission to Google, Unlockd explained in detail its business model, how its apps worked and benefited all stakeholders, and how its apps did not violate the AdMob policies identified by Google.

112.   The October 2017 Appeal was successful.  That same day, a member of the Google policy team reviewed the appeal, and Google reenabled ad serving for the Unlock Rewards app in Australia.  Google also allowed ad serving for the Boost Dealz

and Tesco Mobile Xtras apps to continue.  Google thus acknowledged, again, that Unlockd's technology and business model complied with Google's rules.

### H. Unlockd Nears an Initial Public Offering

113.   After prevailing in its appeal, and in reliance on it, Unlockd moved forward with its plans for an IPO, aiming to raise between $35 million and $50 million AUD with an April 2018 listing on the Australian Stock Exchange.

114.   In October 2017, Unlockd announced to its shareholders a "pre-IPO" private funding round.  This funding would ensure that the company had sufficient capital to continue growing the business through the IPO, which was planned for April 2018.  Between December 2017 and February 2018, Unlockd raised approximately $7 million AUD in this funding round based on an implied pre-money valuation of approximately $153 million AUD.

115.   Having secured the necessary private capital to proceed with the IPO, Unlockd engaged financial and legal advisers, worked with its advisers to value the company and draft a prospectus, and started pitching the offering to potential IPO investors.  Based on a comparable company analysis, Unlockd's financial adviser estimated the company's pre-money enterprise valuation at approximately $200 million AUD, and investors responded positively during the company's non-deal roadshows, leading Unlockd to anticipate an IPO valuation in that general range.

116.   Articles about the IPO also began appearing in the press in November 2017.  These articles generally described Unlockd in glowing terms, calling the company a "technology success story", "promising", and "among Australia's hottest start-ups".  One investor was quoted as calling Unlockd's performance "extraordinary".

117.   Meanwhile, Unlockd continued to expand its business, signing new deals and building out its partner pipeline.  Unlockd's draft IPO prospectus disclosed 26 partners in the pipeline—meaning an expected near-term launch, a signed memorandum of understanding, a memorandum of understanding sent, or advanced discussions about

a deal—reflecting over 165 million addressable users.[6]  And that was only the tip of the iceberg.  Unlockd's draft IPO prospectus disclosed a total addressable user base of over a *billion* users in the telecom, content-streaming, and loyalty market segments, with even more addressable users in other market segments such as gaming.

118.   Unlockd also continued to increase its ARPU (average revenue per user), a key metric for evaluating tech companies like Unlockd.  The first quarter following the launch of the Boost Dealz app, Unlockd's average monthly ARPU was $███ AUD.  By the end of 2017, Unlockd's average monthly ARPU had grown over ███% to $███ AUD, which was significantly higher than average monthly ARPU for comparable companies like Facebook ($2.60 AUD), Twitter ($0.83 AUD), or Snap ($0.65 AUD).  If each addressable user in Unlockd's partner pipeline were to become an active user, that would translate into over $███ AUD in annual revenue for Unlockd.

## I.   Google Reverses Course Again and Wrongfully Eliminates Unlockd as a Competitor

119.   Unfortunately for Unlockd, Google soon reversed course again and used its control over the Google Play Store and AdMob to definitively eliminate Unlockd as a competitor.

120.   On January 23, 2018, Google unexpectedly sent another email to Unlockd (the "January 2018 Email") alleging the same three violations of AdMob policy that Google had previously alleged in the September 2017 Email, and had subsequently overturned under its own internal review procedures.  The email was sent by Google's Mobile Apps Business Leader for Europe, the Middle East, and Africa,

---

[6]The potential partners in Unlockd's pipeline included telecommunications companies ███████████████████████████████████████ entertainment and streaming companies ███████████████; gaming companies ████████████████████████; and ███████████████████████.  Unlockd was engaged at a high level with other potential partners as well, such as ███████████████████████████.

Emmanuel Monnoyeur, who had attended the July 2017 meeting in Dublin and who had confirmed that Unlockd's apps complied with Google policy.  Google gave Unlockd a "hard deadline" of March 31, 2018 to "fix[]" the alleged violations and threatened to discontinue ad serving through AdMob if Unlockd did not do so.

121.    Following the January 2018 Email, Unlockd attempted to meet with Google to discuss Google's purported concerns.  On February 14, 2018, Unlockd was able to connect with Google's Managing Director for Australia & New Zealand, Jason Pellegrino, over email.  After a mutual contact introduced them, Unlockd's CEO at the time, Jane Martino, emailed Mr. Pellegrino offering to meet in Sydney the following week, where Google's Australian headquarters were located.  Mr. Pellegrino replied that he would be on vacation, but offered to "get the right person for you".

122.    Unlockd also tried to reach Google in the United States.  On or about February 16, 2018, Unlockd's Chairman, Richard Kimber, sent a letter to Google's Vice President for Trust & Safety, Tom Siegel, explaining Unlockd's app, business model, and prior interactions with Google regarding AdMob policy.  Mr. Kimber also informed Google that Unlockd was preparing for an IPO on the Australian Stock Exchange in April 2018 and that the AdMob issues and threats raised by Google were "business critical to Unlockd with potentially far reaching, very damaging consequences".  For those reasons, Mr. Kimber requested an extension of the March 31, 2018 deadline and a meeting with Mr. Siegel or other senior decisionmakers to discuss the AdMob policy issues before the deadline.  Mr. Siegel did not respond to this letter.

123.    Following Mr. Kimber's letter, Ms. Martino continued to try to reach a resolution with Mr. Pellegrino in Australia.  On February 17, 2018, Ms. Martino provided to Mr. Pellegrino a copy of Mr. Kimber's letter and requested a brief call to work through the best approach.  In response, Mr. Pellegrino promised to "figure out who the best person for you to talk to" would be and then "set[] up a session where you can meet with someone senior on our T&S safety team to get into details".  On February 19, 2018, Mr. Pellegrino sent an email introducing Ms. Martino to the head of Google's

Trust & Safety team in the Asia Pacific region, Arjun Narayan, and Ms. Martino and Mr. Narayan arranged to meet in person in Sydney on February 22, 2018.  Ms. Martino also repeated Mr. Kimber's request for an extension, but Mr. Pellegrino did not respond to this request.

124.   The day before the planned meeting in Sydney, Mr. Narayan of Google unexpectedly canceled, citing "a few pressing commitments".  In an apparent attempt to avoid meeting with Unlockd at all, Mr. Narayan copied Google's Mr. Monnoyeur—the same person who met with Unlockd in July 2017 and sent the January 2018 Email alleging that Unlockd had violated AdMob policy—to pass off Unlockd to Mr. Monnoyeur.

125.   Following the cancelation of the planned Sydney meeting, Google continued to give Unlockd the run-around.  On February 22, 2018, Ms. Martino's executive assistant emailed Mr. Narayan and his executive assistant to set up a teleconference with Mr. Narayan, offering various times on February 26, 27, or 28. Google did not respond to this email.  On February 25, 2018, Ms. Martino again reached out to Mr. Pellegrino following his return from vacation, expressing her hope to meet with Mr. Narayan that week and repeating her earlier request for an extension.  Mr. Pellegrino did not respond to this email.  On February 26, 2018, Ms. Martino's executive assistant followed up on her request for a teleconference with Mr. Narayan. Google did not respond to this email either.

126.   On March 2, 2018, ignoring Unlockd's requests to meet in person and its prior approval of Unlockd's apps, Google sent a formal letter to Unlockd (the "March 2018 Letter") alleging that Unlockd's apps violated three AdMob policies and—for the first time—one Google Play policy.  Specifically, Google alleged that Unlockd's apps violated the following policies:  (i) "Encouraging Clicks"; (ii) "Valuable Inventory"; (iii) "Disallowed Interstitial Implementation"; and (iv) "Interfering with Apps, Third-party Ads, or Device Functionality".  The first three of these policies were AdMob policies, and the fourth was a Google Play policy.  This

was the first time in over two years of distributing Unlockd's apps through the Google

Play Store that Google claimed that Unlockd's apps might violate Google Play policy.

127.   As to the three AdMob policies—"Encouraging Clicks", "Valuable

Inventory", and "Disallowed Interstitial Implementation"—Google did not provide a

meaningful explanation in the March 2018 Letter for how Unlockd's apps allegedly

violated these policies.

128.   As to the Google Play policy—"Interfering with Apps, Third-party

Ads, or Device Functionality"—Google offered a single-sentence explanation that

appeared to mirror Google's rationale for finding a violation of the Disallowed

Interstitial Implementation policy:  "Ads must be served only within the app

environment."  Google also stated that "[w]e understand that the Google Play team will

reach out to you separately."  The Google Play team never reached out to Unlockd.

129.   In the March 2018 Letter, Google also refused Unlockd's earlier

requests for an extension of the March 31, 2018 deadline and expressly stated that

Google would "not be engaging in further discussion" about whether the current

versions of Unlockd's apps comply with Google policy.  True to that statement, Google

continued to refuse to substantively engage with Unlockd on these issues.

130.   Google's allegations that Unlockd's apps violated AdMob and

Google Play policy were pretextual and did not provide a legitimate business

justification for banning Unlockd from the Google Play Store and AdMob.  As

explained above, Unlockd's apps did not violate the Encouraging Clicks or Disallowed

Interstitial Implementation policies (or, by extension, the Interfering with Apps, Third-

party Ads, or Device Functionality policy).  Unlockd carefully designed its apps so as to

ensure users would not be improperly incentivized to click or view ads, and the app

environment for Unlockd *was* the unlock screen.  As to the Valuable Inventory policy,

Unlockd's apps did not violate the purposes underlying this policy—protecting

advertisers by ensuring that they receive a good return on investment on the inventory

they purchase—because Unlockd's apps offered advertisers an excellent return on

1    investment.  Advertisers received valuable first access to consumers at their most

2    engaged moment—when they unlock their phones—as reflected by Unlockd's high

3    CTRs, which significantly exceeded industry standards.

4            131.   Moreover, Unlockd had already been through these issues with

5    Google.  After Google raised potential policy issues in April 2017 and requested a copy

6    of the app to ensure it complied with Google policy, Unlockd provided Google with the

7    requested copy of the app and explained how it worked in an in-person meeting.

8    Google then approved the app and assured Unlockd that its apps complied with Google

9    policy, even going so far as to approve Unlockd for use of Google's premium, invite-

10   only intermediation service, AdX.

11           132.   The pretextual nature of Google's application of these policies to

12   Unlockd is also evident from the fact that Google has allowed other apps with similar

13   features to be distributed through the Google Play Store and source ads through AdMob.

14           133.   To take one example, when Google sent the March 2018 Letter,

15   Google was doing business with a New Zealand technology startup, Postr, that made an

16   app called "Optus Xtra" for customers of the Australian telecom company Optus.  The

17   Optus Xtra app served ads to Android smartphone users on the "lock screen"—that is,

18   the screen that users view before they unlock their phones—in exchange for mobile data

19   or credit, similar to Unlockd's Boost Dealz and Tesco Mobile Xtras apps.  Optus

20   customers who downloaded the app were served ads automatically on the device's lock

21   screen.  Users could then either tap the advertisement to "find out more", or swipe right

22   to unlock the device and the ad would disappear.  In return for viewing ads, users were

23   rewarded with either 1 GB of extra data or $2 of phone credit per month.  Until Optus

24   voluntarily shut down the app in May 2018, the app was available for download in the

25   Google Play Store.  On information and belief, the Optus Xtra app also served ads

26   sourced through the AdMob network.[7]

27

28   ───────────────────
        [7] A blog post indicated that Postr's software development kit "plugs into some of the
     worlds largest ad exchanges including Google's AdMob".

134.   Google thus allowed smaller upstarts like Postr to proceed (for the time being) on a highly similar business model, while treating Unlockd—which posed a significant competitive threat due to its growth, success in raising capital, and more effective technology—very differently.  Postr had raised only $4.6 million USD in capital (about $6 million AUD using today's exchange rates) before being acquired in January 2021.  By contrast, Unlockd had raised approximately $50 million AUD in private capital before the Google Play and AdMob bans and was poised to raise approximately another $40 million AUD through its IPO.  Unlockd's capitalization put it in a much better position to achieve scale, expand its business, and ultimately cut out Google as an intermediary by shifting to direct advertising business and developing its own ad network.  Meanwhile, Unlockd's technology—which delivered ads to users when they affirmatively decide to *unlock* their phones—was more effective than Postr's technology—which delivered ads to users on the *lock screen*.  Users are much more likely to pay attention to content displayed when they unlock their phones than content displayed on the lock screen, as reflected by Unlockd's superior CTRs.  This made Unlockd's advertising inventory more valuable to advertisers and therefore a greater competitive threat to Google.

## J.   Unlockd Is Forced To Shutter Its Business and Enter Insolvency Proceedings

135.   Following the March 2018 Letter, Unlockd continued to try to engage with Google to come to a mutually acceptable solution.  One Unlockd shareholder who had a direct relationship with Google's CEO, Sundar Pichai, spoke directly with Mr. Pichai to press Unlockd's case.  Unlockd associates and staff contacted members of Google parent company Alphabet's Board of Directors, including its Chairman.  But Google was steadfast and refused to budge.

136.   Once stakeholders learned of Google's actions, everything started to unravel for Unlockd.  To start, Unlockd's existing partners made clear that they would not continue their partnerships without access to the Google Play Store and AdMob.  Unlockd tried to save the company's partnership with Sprint, suggesting that they could

create a webpage where users would directly download the app to their Android smartphones, but Sprint declined. Although understanding and sympathetic regarding Unlockd's troubles, Sprint told Unlockd's CEO, Ms. Martino, that without the Google Play Store, it just wouldn't be feasible to continue doing business. Ultimately, all three of Unlockd's major existing partners—Sprint, Tesco, and Flybuys—terminated their partnerships with Unlockd.

137.    Once Google's actions became public, Unlockd was also unable to move forward with the other partnerships the company had been negotiating. For example, by late April 2018, Unlockd had negotiated a significant multi-territory expansion of the company's partnership with multinational telecommunications company Axiata, with the agreement drafted and ready for the parties to sign. After Google's actions became public, however, Axiata declined to move forward, specifically citing the Google dispute as the reason.

138.    Likewise, Google's actions prevented Unlockd from attracting new partners. Just as existing partners refused to continue doing business with Unlockd without access to the Google Play Store and AdMob, new partners would not sign up without such access either.

139.    Google's actions also made raising capital virtually impossible. Investors had expressed strong interest in the IPO during the company's roadshows, but once Google's threats were disclosed, both public and private investors backed away. This starved Unlockd of critical funds needed to sustain the company's operations and growth.

140.    In attempt to save itself, Unlockd filed antitrust lawsuits against Google in the United Kingdom and Australia and succeeded in obtaining interim injunctions against Google. These interim injunctions barred Google from removing Unlockd's Tesco Mobile Xtras and Unlock Rewards apps from the Google Play Store or AdMob in the United Kingdom and Australia, respectively. But this relief was only preliminary, leaving uncertainty about whether Unlockd could continue operating in

those countries.  To obtain permanent relief, Unlockd would need to take the cases to trial—and spend substantial sums of money (that it did not have and could not raise) on legal expenses.

141.    Moreover, these interim injunctions only covered the United Kingdom and Australia, leaving Google free to move forward with its plan in the United States.  The United States was Unlockd's most commercially important territory, accounting for a majority of Unlockd's revenue, so the loss of access to the Google Play Store and AdMob there would be devastating for the entire company.  On June 8, 2018, despite two courts having ruled against it in the United Kingdom and Australia, Google removed the Boost Dealz app from the Google Play Store and disabled the app's access to AdMob.  This was disastrous for Unlockd both in the United States and abroad.

142.    Ultimately, Google succeeded in eliminating Unlockd as a competitor.  With existing partners backing out, new partners unwilling to commit, and investors reluctant to supply more capital—all due to Google's actions—Unlockd was forced to file for bankruptcy and cease operations.  On June 12, 2018—four days after Google terminated the Boost Dealz app's access to the Google Play Store and AdMob—Unlockd Limited initiated insolvency proceedings in Australia.  In August 2018, Unlockd's two U.K. subsidiaries, Unlockd Media Technology Limited and Unlockd Media Operations Limited, initiated insolvency proceedings in the United Kingdom.  On October 26, 2018, Unlockd Media and Unlockd Operations filed for protection under Chapter 11 of the United States Bankruptcy Code.

143.    Google's ban of Unlockd from the Google Play Store and AdMob was the direct cause of Unlockd's demise.  As one article observed after the company's bankruptcy filing, Unlockd "seemed to have everything going for it at one point".  But without the ability to distribute and update its apps through the Google Play Store and source advertisements through AdMob, Unlockd simply could not do business.  As Unlockd's partners made clear when terminating their partnerships with Unlockd, the Google Play Store was the only feasible channel through which Unlockd could

distribute its apps to users, as the Google Play Store is the "official" Android app store and accounts for over 90% of app downloads through Android app stores.  As Flybuys notified its customers: "We regret to inform flybuyers that the Unlock Rewards app will be discontinued from 12pm, 22 June [2018] and you'll no longer be able to collect points using the app. The technology partner that powers Unlock Rewards, exclusive to flybuys, has gone into voluntary administration following unanticipated action from Google to remove their apps from Google Play Store, including Unlock Rewards."  And AdMob accounted for approximately 80% of Unlockd's revenues at the time; its loss was devastating.  Together, the Google Play Store and AdMob bans dealt a fatal blow to Unlockd.

## K.   Having Eliminated Unlockd as a Competitor, Google Invests in and Partners with Another Company with a Similar Business Model

144.   Google banned Unlockd from the Google Play Store and AdMob to eliminate Unlockd as a competitor.  Google abandoned a voluntary and profitable business relationship with Unlockd—Google had earned millions of dollars through its cut of the advertising revenue generated by Unlockd, and the rewards that Unlockd made available to users made the Android OS more attractive to consumers—suggesting a willingness to forsake short-term benefits to achieve anticompetitive ends.  Unlockd immediately suspected anticompetitive motives, but the full import of Google's anticompetitive conduct only became apparent when Google made a substantial investment in and partnered with a company essentially employing Unlockd's business model.

145.   After eliminating Unlockd from the scene, Google kept watch over the "prestitial" (*i.e.*, pre-home screen) mobile space, recognizing the value of a mobile platform centered around the lock or unlock screen.  In December 2020, Google made a major investment in Glance:  a startup self-described as "the world's leading lock screen platform".  Google led a $145 million funding round and is, according to Glance's CEO, one of Glance's two "key investors".

146.   Glance operates in the same prestitial mobile space that Unlockd operated in.  Just like Unlockd delivered content to users on the unlock screen, Glance delivers content to users on the lock screen.  The difference between the lock and unlock screen is minor, with Unlockd's draft IPO prospectus acknowledging lock-screen apps as Unlockd's most significant competitors.  The main difference is that unlock-screen advertising is much more effective.  Moreover, Glance's terms of service provide that Glance may deliver content to users on the *unlock* screen as well.

147.   Glance has been secretive about its monetization strategy, but the company's terms of use and other information in the fine print on its website show that it's all about targeted advertising, sponsored content, and user surveys, both on the lock and the unlock screen—just like Unlockd.  Glance's End User License Agreement ("EULA") states that the company's "proprietary platform" "enables end-users to explore and discover content or services through lock-screen including interesting stories, news, events, games, *advertisements*, etc."  Importantly, the EULA provides: "*As they unlock their phone, the platform also enables Glance's partners to display advertisements, promotional offers and/or games . . . .*"  Glance's privacy policy describes in detail how Glance may collect user information to deliver "interest-based advertising" and "targeted advertising", which was one of Unlockd's main pitches to advertisers.  Glance even has "Survey or Marketing Terms" that set forth how Glance will conduct user surveys for its business partners, similar to Unlockd's Earn Wall feature.  And in case there was any doubt about the company's focus specifically on advertising, Glance's website sets forth "Advertiser Terms" that detail the company's relationship with advertisers.

148.   Google appears to be not just a passive investor in Glance, but an active partner.  Glance's CEO has described Google as a "strategic investor", which means that Google invested primarily for strategic rather than financial reasons (*e.g.*, to gain access to a new technology or product).  Moreover, Glance's CEO has said that Glance plans to use its partnership with Google to launch in the United States, where

they will team up with telecommunications carriers.  Of course, that is exactly what Unlockd did in the United States with the Boost Dealz app, which was a partnership with U.S. telecommunications company Sprint.

149.   Fortunately for Google and Glance, Unlockd was no longer standing in the way to compete in the prestitial mobile advertising space—because Google had put Unlockd out of business.

## III.   Google's Market Power in the Digital Advertising Market

### A.   Product Market

150.   There is a relevant antitrust market for the sale of digital advertising inventory to advertisers (the "Digital Advertising Market").  "Digital advertising" refers to advertising delivered to consumers personally through the internet on their computers, smartphones, or other digital devices, excluding classified advertisements. "Inventory" refers to ad space that publishers sell to advertisers.

151.   Digital advertising inventory is not reasonably interchangeable with offline advertising inventory because advertisers do not view these two types of advertising as reasonable substitutes for each other.  As a result, a small but significant and non-transitory increase in price for digital advertising inventory would not lead a significant number of advertisers to switch to offline advertising.  In economic terms, a hypothetical monopolist of the Digital Advertising Market could profitably impose a small but significant and non-transitory increase in price above competitive levels.

152.   One reason for the limited substitutability between digital and offline advertising is that digital advertising allows for much more finely tuned targeting of consumers.  Offline advertising such as newspaper, billboard, TV, and radio ads cannot be targeted at a specific consumer based on individualized consumer data, leaving advertisers with fairly blunt tools to reach the right audience.  By contrast, digital advertising allows advertisers to target consumers based on specific consumer data points such as demographic characteristics, search queries, and web browsing history. Because digital advertising allows advertisers to use individualized consumer data to

target specific audiences, the U.K. Competition & Markets Authority concluded in a July 2020 report that "[t]here is limited substitutability between digital advertising and traditional advertising media." The Authority based this conclusion on extensive interviews with advertisers and media agencies and other qualitative research.

153. Advertisers typically allocate different budgets for digital and offline advertising before they even set up a campaign, further evidencing limited substitutability between digital and offline advertising.

154. Moreover, market participants and the public generally regard the Digital Advertising Market as economically distinct from the offline advertising market. For example, industry data aggregators frequently separate digital advertising from offline advertising in providing market share estimates.

155. Classified advertising inventory is not reasonably interchangeable with digital advertising inventory because advertisers do not view these two types of advertising as reasonable substitutes for each other. Classified advertising and digital advertising serve entirely different purposes. Advertisers usually place classified ads to sell a unique asset or hire an employee for a specific job. For example, a tenant might place a classified ad on Craigslist to find a roommate, or an employer might place a classified ad on a job board to fill an assistant manager position. By contrast, advertisers who wish to sell largely fungible products and services do not find classified ads to be useful for selling those products or services. For example, Procter and Gamble would not try to sell laundry detergent with a classified ad on Craigslist. As a result, a small but significant and non-transitory increase in price for digital advertising inventory would not lead a significant number of advertisers to switch to classified advertising. In economic terms, a hypothetical monopolist of the Digital Advertising Market could profitably impose a small but significant and non-transitory increase in price above competitive levels.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Geographic Market**

156.   The geographic scope of the Digital Advertising Market covers advertising delivered to consumers located in the predominantly English-speaking countries of the United States, Canada, the United Kingdom, Ireland, Australia, and New Zealand.  Advertising delivered to consumers located in these countries is not reasonably interchangeable with advertising delivered to consumers located in other countries because advertisers do not view reaching consumers in the United States, Canada, the United Kingdom, Ireland, Australia, and New Zealand as a substitute for reaching consumers in other countries due to language, cultural, and socioeconomic differences.  Indeed, other countries often have completely different advertisers, and the advertisers that do operate in both sets of countries often set up entirely different campaigns to target consumers in other countries and use entirely different branding for their products.

157.   In the alternative only, the geographic scope of the Digital Advertising Market is the United States.

**C.    Google's Dangerous Probability of Achieving Monopoly Power in the Digital Advertising Market**

158.   Google has a dangerous probability of achieving monopoly power in the Digital Advertising Market.

159.   Google's dangerous probability of achieving monopoly power can be demonstrated by, among other things, Google's substantial market share as measured by revenue.  One market data source indicates that at the time Google decided to ban Unlockd from the Google Play Store and AdMob, Google's had about a 44% share of the net revenue in the Digital Advertising Market in the United States, far more than any competitor.  Other market data sources indicate that Google had similarly high market shares as measured by revenue in the other countries comprising the Digital Advertising Market around the same time, with approximately 48% in Canada, 40% in the United Kingdom, and 49% in Australia.  Google's market share in Ireland and New Zealand— which are much smaller countries than the other countries within the Digital Advertising

Market and are responsible for a tiny fraction of the Market's revenue—is likely similar or higher.

160.   Despite their substantial size, however, these revenue-based market share estimates underestimate Google's market power in the Digital Advertising Market.  Google earns revenue both in its capacity as a publisher through its Search and YouTube platforms and in its capacity as an intermediary through services like AdMob.  When it acts as a publisher, Google captures all or nearly all the advertiser's expenditure.  When it acts as an intermediary, however, Google takes only a cut of the advertiser's expenditure (*e.g.*, 30%), while still exercising control over pricing and competition.  Revenue-based market share estimates, which are based on net rather than gross revenue, therefore underestimate Google's market power.

161.   In addition to its high market share, Google benefits from barriers to entry and expansion that increase its probability of achieving monopoly power in the Digital Advertising Market.

162.   One significant barrier to entry and expansion results from Google's vast collection of consumer data, which advertisers need to properly target their ads.  Google has enormous amounts of consumer data, obtained by Google by tracking consumers while they use Google's various products.  Google keeps tabs on consumers every time they enter a search query, watch a video on YouTube, read or compose an email using Gmail, or browse the web through Google Chrome—to cite just a few examples.  Google also has extensive data on user location.  Google collects location data for Android smartphone users who have location services activated (which half to two thirds of users do) and even iPhone users who have Google Maps installed.  Google uses this vast trove of consumer data to help advertisers optimize their targeting of consumers, creating a barrier that would-be rivals find tremendously difficult to overcome.

163.   Google is poised to further fortify this barrier by phasing out the use of third-party cookies in its Google Chrome web browser.  To target the right

consumers, advertisers often rely on "cookies", which are small pieces of data stored on users' computers that help to track user activity on the internet. Citing consumer privacy concerns, Google has started phasing out the use of third-party cookies from its Google Chrome web browser, which is the dominant web browser with about half the U.S. market. However noble Google's privacy explanation may sound, the effect of this action will be to deepen Google's data advantage and strengthen barriers to entry in the Digital Advertising Market. Although Google will be phasing out third-party cookies from Chrome, Google will not stop tracking its users' activity through other means, forcing advertisers to come to Google for that data to effectively target consumers.

164.    Google also strengthens its market power in the Digital Advertising Market by leveraging its market power in adjacent markets, such as online search engine services and licensable mobile OSs, to foreclose competition in the Digital Advertising Market. These actions create additional barriers to entry and expansion in the Digital Advertising Market, thereby further increasing the probability that Google will achieve monopoly power in the Digital Advertising Market.

165.    For example, Google has used its control over the Android OS to foreclose competition in the Digital Advertising Market by making Google the default search engine for virtually all Android devices. As of December 2017, the Android OS was used on approximately 73.5% of smartphones globally.

166.    Google effectively forces Android smartphone original equipment manufacturers into interlocking, anticompetitive agreements that make Google the default search engine on Android devices; manufacturers who do not make Google the default search engine risk discipline by Google and losing access to essential apps such as the Google Play Store. These agreements ultimately compel advertisers to go through Google to purchase search advertising inventory if they want to reach the many users who enter search queries on their Android devices. Very few consumers change the default on their device from Google to some other search engine—as one Google executive put it, "most users just use what comes on the device". Highlighting these

agreements' exclusionary nature, in a draft 2014 Google strategy deck, Google described certain of these agreements as "provid[ing] exclusivity of Search" or "protect[ing] Search exclusivity". Similarly, a Google executive described certain of these agreements as providing "exclusivity".

167. Google has engaged in similar anticompetitive behavior in its dealings with Apple through contracts under which Apple agrees to make Google the default search engine on Apple's Safari web browser, which is the default web browser for iOS devices, in exchange for substantial payments from Google. Because approximately 99% of smartphones use either Android OS or iOS, this makes Google's search engine the default for nearly all smartphones and makes Google a necessary counterparty for advertisers who wish to purchase mobile search advertising inventory. With mobile advertising having recently eclipsed desktop advertising as a share of the overall Digital Advertising Market—and this trend being expected to continue— Google's dominance in mobile search advertising further increases the probability that Google will achieve monopoly power in the broader Digital Advertising Market.

168. Google has also entered revenue-sharing agreements with other web browsers, which together with Google's own Chrome browser cover 85% of all browser usage in the United States, that require Google to be the default search engine.

169. Google is also positioning itself to control emerging channels for search distribution, and by extension increase its dominance in the Digital Advertising Market, by excluding new and established rivals from search on next-generation devices such as smart watches, smart speakers, smart TVs, and connected automobiles. For example, Google has interpreted certain of its existing exclusionary agreements with Android mobile partners to cover next-generation devices, and Google has insisted on similar exclusionary terms with connected-device manufacturers that do not sell Android smartphones. This results in users of next-generation devices using Google for the searches they perform on those devices, further driving Google's dominance in search advertising and by extension the Digital Advertising Market.

170.   Ultimately, Google's dominant share and exclusionary practices in the online search engine market also create barriers to entry and expansion in the Digital Advertising Market, of which search advertising is a major component, thereby increasing Google's probability of achieving monopoly power in the Digital Advertising Market.

## IV.   Anticompetitive Conduct

171.   Through the actions alleged above, Google engaged in anticompetitive conduct by unlawfully excluding Unlockd from the Digital Advertising Market.

172.   By banning Unlockd from the Google Play Store and AdMob without any legitimate justification, Google unlawfully excluded Unlockd from the Digital Advertising Market.  Unlockd competed with Google in this Market by delivering first-access, hyper-targeted advertising that, unlike Google's advertising, was a "win-win-win" with benefits for users, advertisers, and partners alike.  As a result of Google's anticompetitive conduct, Unlockd was no longer a competitive threat to Google in the Digital Advertising Market.

173.   In banning Unlockd from the Google Play Store and AdMob, Google unilaterally terminated a voluntary and profitable course of dealing with Unlockd. Google had been distributing Unlockd's apps through the Google Play Store for over *two years* before Google suddenly and unexpectedly accused Unlockd's apps of violating Google Play policy.  Likewise, Google had been intermediating sales of Boost Dealz and Tesco Mobile Xtras inventory for Unlockd through AdMob for over 10 months before first alleging AdMob policy violations and 14 months before overturning its prior determination under its internal review procedures that Unlockd's apps complied with Google policy.  This voluntary course of dealing between Unlockd and Google yielded millions of dollars of revenue for Google, as well as other benefits to the Android ecosystem generated by Unlockd's apps.

174.   As explained earlier in this Complaint, Google had no valid business justification for its actions in cutting off Unlockd's access to the Google Play Store and Google's AdMob service, and its claimed justifications for taking such actions were pretextual.  In banning Unlockd from the Google Play Store and AdMob, Google sacrificed short-term benefits to obtain higher profits in the long run by excluding Unlockd, a significant and growing competitor, from the Digital Advertising Market. Google sole's reason for taking these actions was to eliminate Unlockd as a competitor and thereby foreclose competition in the Market.

175.   Meanwhile, Google has continued to distribute similarly situated customers' apps through the Google Play Store and to intermediate sales of similarly situated customers' mobile app advertising inventory through AdMob.  For example, Google continued to allow the Optus Xtra app to access the Google Play Store and AdMob following the March 2018 Letter.

## V.   Anticompetitive Effects

176.   Google's anticompetitive conduct has foreclosed competition in the Digital Advertising Market, affected a substantial volume of commerce in the Market, and caused anticompetitive harms to advertisers, consumers, and competing publishers.

177.   Google's conduct foreclosed competition in the Digital Advertising Market by forcing Unlockd to exit the Market as a competitor to Google.  As explained above, but for Google's conduct, Unlockd would have continued to compete with Google in the Market and would have expanded even further.  Google's conduct forced Unlockd to cease operating entirely.

178.   Google's exclusion of Unlockd from the Digital Advertising Market has harmed both advertisers and consumers.  To start, had Google allowed it to continue doing business, Unlockd would have increased the total supply of digital advertising inventory, leading to lower prices for advertisers.  Moreover, advertisers lost an innovative, hyper-targeted form of advertising that provided them with a high return on investment.  Consumers lost a source of relevant ads and other content, not to mention a

valuable rewards opportunity that allowed them to share in the advertising revenue received by publishers.  Meanwhile, the well-publicized story of Unlockd's demise[8] disincentivized other would-be rivals from attempting to provide similar innovative advertising solutions, thereby creating spillovers beyond the effect of the loss of Unlockd alone.  In the language of economists, excluding Unlockd increased prices, reduced innovation and quality of service, and lowered output.

179.    Google's exclusion of Unlockd from the Digital Advertising Market also harmed Unlockd as a competing publisher, which otherwise would have had the ability to offer users, advertisers, and partners its innovative form of advertising that benefits all stakeholders.

180.    Moreover, Google's elimination of Unlockd gave Google the opportunity to replace Unlockd with Glance, over which Google exercises control, and use Glance to help Google achieve monopoly power in the Digital Advertising Market, thereby creating additional anticompetitive effects.  Google did not simply eliminate a competitor; it eliminated a competitor and moved in on the same space.

## VI.    Antitrust Injury

181.    Plaintiff has suffered antitrust injury as a direct result of Google's unlawful conduct.  As a direct and proximate result of Google's anticompetitive conduct, as alleged herein, Plaintiff suffered substantial losses to its business or property including the loss of substantial profits and future profits from selling mobile advertising inventory and other services to advertisers and other third parties.

182.    As a direct consequence of Google's anticompetitive conduct, Unlockd Media and Unlockd Operations could no longer operate and expand Unlockd's business in the United States, causing them to lose substantial profits and future profits from the active Boost Dealz partnership and expected future partnerships with

---

[8] Numerous media outlets reported on Unlockd's insolvency and prominently highlighted Google's actions in their reporting.  *See, e.g.*, Jonathan Randles, *Australian Startup Unlockd Files for Bankruptcy, Blaming Google*, Wall St. J. (Oct. 29, 2018), https://www.wsj.com/articles/australian-startup-unlockd-files-for-bankruptcy-blaming-google-1540850298.

companies such as ███████████████████████████████████, and more. Unlockd Media and Unlockd Operations would have profited from these partnerships by selling digital advertising inventory and other services to advertisers and other third parties, thereby challenging Google's market power in the Digital Advertising Market. In challenging Google in this Market, Unlockd Media and Unlockd Operations would have decreased prices and costs and increased innovation, quality of service, and output. For example, Unlockd would have continued to provide its innovative form of first-access, hyper-targeted advertising to advertisers—while sharing the resulting revenue with consumers and providing important customer acquisition and retention benefits to its partners—and it would have expanded that business even further in the United States, with multiple deals signed and potential partnerships in the works in areas ranging from telecommunications to content streaming to gaming to retail. Accordingly, Unlockd Media and Unlockd Operations were injured in a manner that the antitrust laws were intended to prevent.

183.   As a direct consequence of Google's anticompetitive conduct, Unlockd Limited lost the opportunity provide continued financing support for its subsidiaries' operations and lost substantial profits and future profits that would have been earned through those subsidiaries.  Google's anticompetitive conduct directly caused Unlockd Limited to suspend its imminent IPO because investors would not participate in it once they learned of Google's decisions to remove Unlockd's apps from the Google Play Store and disable access to AdMob.  In addition, Unlockd Limited lost all meaningful opportunities to raise capital from private investors, who would not supply capital to Unlockd in light of Google's actions.  As a result, Unlockd Limited was unable to secure capital to support its subsidiaries' continued operation and expansion of Unlockd's business.

184.   Unlockd Limited's injuries were foreseeable.  Google was aware, or should have been aware, that the scuttling of Unlockd's IPO and its inability to find alternative funding would be the likely effect of its anticompetitive conduct.  Google

became aware of Unlockd's IPO as early as the fall of 2017 and no later than February 2018, and as a routine provider of venture capital funding to growth-stage tech startups, Google thoroughly understood the critical importance of raising capital to a company in Unlockd's position.  Absent Google's anticompetitive conduct, Unlockd Limited could have continued to support its subsidiaries in operating and expanding Unlockd's innovative business in the United States and abroad, resulting in substantial profits through the sale of mobile advertising inventory and other services to advertisers and other third parties.  These activities would have challenged Google's market power in the Digital Advertising Market and, as a result, decreased prices and costs and increased innovation, quality of service, and output in the Market.  Accordingly, Unlockd Limited was injured in a manner that the antitrust laws were intended to prevent.

185.   Additionally, Google's anticompetitive conduct directly caused Unlockd Limited to lose profits and future profits earned by revenue generated by its non-U.S. operating subsidiaries.  Unlockd Limited and its non-U.S. subsidiaries acted as a single enterprise, with Unlockd Limited exercising continuing supervision and control over, and intervention in, its subsidiaries' affairs.  As a direct consequence of Google's anticompetitive conduct, Unlockd Limited's non-U.S. subsidiaries lost the opportunity to profit from selling digital advertising inventory and other services to advertisers and other third parties, thereby challenging Google's market power in the Digital Advertising Market.  This competition would have decreased prices and costs and increased innovation, quality of service, and output in the Market.  For this reason too, Unlockd Limited was injured in a manner that the antitrust laws were intended to prevent.

## VII.   Effects on Domestic Commerce

186.   The anticompetitive conduct that caused Plaintiff's injuries, as alleged herein, has had a direct, substantial, and reasonably foreseeable effect on domestic commerce in the United States.  This domestic effect gives rise to Plaintiff's Sherman Act claims.

187. The primary effects of Google's anticompetitive conduct have been on domestic commerce. Google made a global decision to terminate access to the Google Play Store and AdMob for *all* of Unlockd's apps, both in the United States and abroad. Given the commercial importance of the United States to both Unlockd and Google, however, it is clear that the geographic target of Google's actions was the United States. The United States was the most significant source of revenue for Unlockd, with the Boost Dealz app generating a majority of the company's revenue on a consolidated basis. The primary stakeholders who benefited from use of the Boost Dealz app were located in the United States: Unlockd Media and Unlockd Operations were Delaware corporations headquartered in New York; Sprint was a Kansas corporation headquartered in Kansas; Boost Dealz's users lived and used the app in the United States; and the advertisers who bought Boost Dealz inventory included numerous U.S. advertisers. Likewise, Google has publicly reported that, in the year preceding Google's exclusion of Unlockd from the Digital Advertising Market, nearly half of Google's revenues came from the United States.

188. The United States was expected to continue to be the most important source of revenue for Unlockd, with additional partnerships expected to launch soon. For example, Unlockd had signed deals to launch partnerships in the United States with telecom company ███████ and gaming companies ███████ ███████. Unlockd was negotiating additional partnerships that would cover the United States as well, with advanced discussions about a potential deal with well-known U.S. companies such as ███████; quick-service restaurant chain ███████; and entertainment companies ███████ ███. Unlockd Media, Unlockd Operations, and Unlockd Limited would have earned substantial revenue from these partnerships.

189. Accordingly, the anticompetitive effects of Google's actions have manifested primarily in commerce in the United States, where advertisers, consumers,

1    and other third parties were deprived of an innovative technology, thereby increasing

2    prices, reducing innovation and quality of service, and lowering output.

3            190.    Additionally, the anticompetitive effects of the loss of Unlockd's

4    apps in foreign countries are not independent from the domestic harm and include

5    substantial effects on domestic commerce in the United States.  Unlockd's second and

6    third most commercially significant active apps were the Tesco Mobile Xtras and

7    Unlock Rewards apps.  These two apps were available to Android smartphone users in

8    the United Kingdom and Australia, respectively, both of which are included in the

9    geographic scope of the Digital Advertising Market.  The United States, however, is the

10   source of the majority of revenue in the Digital Advertising Market—approximately

11   three quarters in 2020.  Accordingly, because the relevant antitrust market includes both

12   the United States as well as the United Kingdom and Australia, the anticompetitive

13   effects resulting from Google's decision to ban the Tesco Mobile Xtras and Unlock

14   Rewards apps have had spillover effects in the United States, including increased prices,

15   reduced innovation and quality of service, and lowered output.

16           191.    Moreover, a number of the advertisers who purchased inventory

17   from Unlockd to deliver ads to foreign consumers, including to users of the Tesco

18   Mobile Xtras and Unlock Rewards apps, were based in the United States.  The impact of

19   the loss of those advertisers to reach foreign consumers through Unlockd's platform

20   created additional domestic effects, and these sales of foreign advertising inventory to

21   U.S. advertisers qualifies as import commerce.  In the Digital Advertising Market,

22   advertisers are the buyers and publishers are the sellers.  Advertisers who purchased

23   advertising inventory from Unlockd to display advertisements to Tesco Mobile Xtras

24   and Unlock Rewards users included advertisers based in the United States.  Those

25   transactions between U.S. buyers and foreign sellers constitute import commerce, and

26   their loss has a direct, substantial, and reasonably foreseeable effect on domestic

27   commerce in the United States.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

192.   The effects of Google's anticompetitive conduct on domestic commerce give rise to Plaintiff's Sherman Act claims.  As detailed above, the primary cause of Unlockd Media, Unlockd Operations, and Unlockd Limited's injuries was the loss of trading opportunities in the United States, which generated a majority of Unlockd's revenues and were understood as such by prospective investors.  The loss of those opportunities was devastating for the entire company and was directly responsible for Unlockd Limited's inability to continue supporting its U.S. and foreign subsidiaries alike.  Accordingly, the anticompetitive effects of Unlockd's losses in the United States give rise to Plaintiff's claims, including any claims relating to the loss of trading opportunities outside of the United States.  And to the extent that Unlockd Limited and injuries resulted from the loss of trading opportunities outside the United States, those injuries are not independent from the domestic harm and also have direct, substantial, and reasonably foreseeable effects on commerce in the United States.

193.   Moreover, even where Google acted to stifle competition in a way that had effects abroad, Google's anticompetitive conduct emanated from the United States.  Google LLC employees located in California made the determinations that Unlockd's apps violated Google Play and AdMob policy, and Google LLC's California-based CEO, Sundar Pichai, made the final, global determination to remove Unlockd's apps from the Google Play Store and disable access to AdMob.  California-based Google LLC was thus the final decisionmaker and driving force behind Google's global decision to ban Unlockd's apps from the Google Play Store and AdMob as part of its scheme to monopolize the Digital Advertising Market, including in the United States.  Any foreign conduct by Google's foreign subsidiaries to execute that scheme is attributable to Google LLC.  Indeed, Google admitted in the U.K. litigation that Unlockd brought against Google that "all non-US entities act as agents of Google LLC in California."

## COUNT 1:  Sherman Act § 2
### (Attempted Monopolization in the Digital Advertising Market)
### (against all Defendants)

194.   Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the paragraphs 1 through ___ of this Complaint as if fully set forth herein.

195.   Google's conduct violates Section 2 of the Sherman Act, which prohibits the "attempt[ed]" "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

196.   The Digital Advertising Market is a valid antitrust market.

197.   Google has unlawfully attempted to monopolize the Digital Advertising Market through the anticompetitive acts described herein, including by eliminating Unlockd as a competitor with the sole purpose of foreclosing competition in the Market.

198.   At the time Google eliminated Unlockd as a competitor, Google had a dangerous probability of achieving monopoly power in the Digital Advertising Market.

199.   In eliminating Unlockd as a competitor in the Digital Advertising Market, Google had a specific intent to monopolize that Market.

200.   Google's conduct has affected a substantial volume of interstate commerce.

201.   Google's conduct has had substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

202.   As a competitor of Google, Plaintiff has been harmed by Google's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. But for Google's anticompetitive ban of Unlockd from the Google Play Store and AdMob, Unlockd would have continued to challenge Google as a competitor in the Digital Advertising Market.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants:

A.  Awarding Plaintiff damages (including, without limitation, lost profits and future profits), trebled pursuant to 15 U.S.C. § 15(a), in an amount to be determined at trial;

B.  Awarding Plaintiff pre- and post-judgment interest;

C.  Awarding Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

D.  Awarding any and all other such relief as the Court may deem proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of all issues so triable.

# GLOSSARY

**Ad Exchange:**  Publisher-facing digital advertising intermediary that functions as an auction-like platform where advertisers bid to place advertisements with publishers, similar to a stock exchange in a financial market.

**Ad Network:**  Publisher-facing digital advertising intermediary that buys ad inventory from a publisher and sells it to an advertiser, similar to a broker-dealer in a financial market.

**AdMob:**  The most dominant mobile ad network; owned by Google.

**AdX:**  The most dominant mobile ad exchange; owned by Google.  Now vertically integrated with Google's publisher ad server and branded as Google Ad Manager.

**Android OS:**  The Android operating system; owned by Google and the most dominant mobile operating system worldwide.

**App:**  Mobile application used on a smartphone.

**ARPU:**  Average revenue per user.

**AUD:**  Australian dollars.

**Boost Dealz:**  Attention-based mobile rewards application developed by Unlockd and made available to Boost Mobile customers.

**CTR:**  Click-through rate.

**DDA:**  The Google Play Developer Distribution Agreement.

**Direct Advertising:**  Digital advertising where the advertiser and the publisher deal with each other directly, without an ad network or ad exchange intermediating the sale of inventory.

**Display Advertising:**  Digital advertising in which the consumer is shown an image-based advertisement.

**Earn Wall:**  A product feature introduced by Unlockd to give users the opportunity to earn rewards by viewing videos, downloading apps, participating in surveys, or completing other in-app tasks.

**Glance:**  Google-backed startup that has developed a platform to deliver advertisements and content to smartphone users on the lock or unlock screen.

**Google Play Store:**  The official Android app store; owned by Google and the most dominant Android app store.

**Indirect Advertising:**  Digital advertising where the advertiser and the publisher deal with each other indirectly, with an ad network or ad exchange intermediating the sale of inventory.

**Inventory:**  Space where an advertisement can be displayed, such as on websites or in apps, that can be sold to advertisers.

**Lock Screen:**  The screen on a smartphone visible to users before the user unlocks his or her device.

**OS:**  Operating system.

**Publisher:**  Entity or individual who sells advertising inventory to advertisers, such as the operator of a website or mobile application.

**Search Advertising:**  Form of digital advertising in which the consumer is shown an advertisement alongside internet search results.

**Tesco Mobile Xtras:**  Attention-based mobile rewards application developed by Unlockd and made available to Tesco Mobile customers.

**Unlock Rewards:**  Attention-based mobile rewards application developed by Unlockd and made available to participants in the Flybuys loyalty program.

**Unlock Screen:**  The screen on an Android smartphone created by Unlockd and visible to Android users after they unlock their devices but before they visit the home screen.

**White-Label App:**  A mobile application built by an app developer to be rebranded with another company's branding.

Dated:  September 17, 2021

Respectfully submitted,

By:      */s/ Evan R. Chesler*

**CRAVATH, SWAINE & MOORE LLP**

Evan R. Chesler (Bar No. N/A)
echesler@cravath.com
Keith R. Hummel (*pro hac vice forthcoming*)
khummel@cravath.com
Yonatan Even (*pro hac vice forthcoming*)
yeven@cravath.com
Lauren Rosenberg (*pro hac vice forthcoming*)
lrosenberg@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

Complaint