UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNLOCKD MEDIA, INC. LIQUIDATION TRUST,<br><br>    Plaintiff,<br><br>    v.<br><br>GOOGLE LLC, et al.,<br><br>    Defendants. | Case No. 21-cv-07250-HSG<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 61 |

Pending before the Court is the motion to dismiss Plaintiff's First Amended Complaint (Dkt. No. 54-3, "Compl.") filed by Defendants Google LLC, Google Ireland Ltd., Google Commerce Ltd., and Google Asia Pacific Pte. Ltd. ("Defendants" or "Google"). Dkt. No. 60 ("Mot."). The motion is fully briefed. *See* Dkt. Nos. 69-1 ("Opp."), 72 ("Mot. Reply"). The Court held a hearing on the motion to dismiss. Dkt. No. 99. For the reasons discussed below, the Court **GRANTS WITH LEAVE TO AMEND** Defendants' motion to dismiss.

**I.   BACKGROUND**

Plaintiff, Unlockd Media, Inc. Liquidation Trust ("Plaintiff" or "Unlockd"), is a New York trust established under an August 2021 trust agreement between the bankruptcy estates of Unlockd Media, Inc. and Unlockd Operations U.S., Inc.  Compl. ¶ 12.[1]  Unlockd alleges that its smartphone application allowed users to "receive full-screen mobile ads or content upon unlocking their Android smartphones, and in exchange, they received virtual 'points' that they could redeem for rewards such as mobile credit, subsidized streaming services, additional loyalty points, or in-app

---

[1] The trust is authorized by the United States Bankruptcy Court for the Southern District of New York's Order Confirming the Fourth Amended Small Business Debtors' Combined Plan of Liquidation and Disclosure Statement (the "Plan") in *In re Unlockd Media, Inc.*, Case No. 18-13243 (JLG) (Bankr. S.D.N.Y.).  Compl. ¶ 12.

benefits like extra lives in mobile games." Compl. ¶ 4, 51-56.

Unlockd was a customer and competitor of Google in the digital advertising market. Compl. ¶ 7. Beginning in 2015, Unlockd operated on the Google Play Store, the store for Android app distribution. Compl. ¶¶ 6, 60, 63. In 2016, Unlockd started to utilize Google AdMob, a mobile advertising network that connects developers to advertisers seeking to purchase ad space on apps. Compl. ¶¶ 6, 70. Plaintiff acknowledges it is subject to the terms and conditions of AdMob and the Play Store, known as Google's Developer Distribution Agreement and AdSense Terms of Service (the "Agreements"). Compl. ¶ 25.

In April 2017, five months after Unlockd started using AdMob, Google contacted Unlockd seeking a virtual meeting to discuss "future revenue growth strategies and ad units placement improvement in order to comply with Google policy." Compl. ¶ 77. Following a virtual meeting between AdMob and Unlockd, Plaintiff asserts Google stated its policies require that "ads can only be shown in the app environment" and that "the app doesn't encourage users to click adds." *Id.* Following a June 2017 meeting, Plaintiff alleges Google "represent[ed] to Unlockd that its apps did not violate Google policy." Compl. ¶ 79.

Beginning on August 20, 2017, Google purportedly permitted Unlockd to operate its first loyalty rewards app that allowed users to "view full-screen ads upon unlocking their Android devices" in exchange for a "a type of virtual currency that consumers could use to buy other products or services." Compl. ¶ 83. Unlockd alleges that Google changed course on September 20, 2017, when Google said it disabled AdMob from serving Unlockd's Australian app. Compl. ¶ 97. Unlockd alleges that Google said it disabled the app because Unlockd's rewards program was not in compliance with Google's "Incentivized Traffic" policy. *Id.* Google stated that "AdMob publishers are not permitted to place AdMob ads on applications with content related to programs offering incentives to click links or ads, read emails, or visit other applications or websites. This would include, for instance, auto-surf apps, pay-to-read email networks, and apps comparing various pay-to-click programs." *Id.*

In response to Unlockd reaching out to AdMob to re-enable its apps, Google sent an email in September 2017 stating that Unlockd violated three policies: Pages That Offer Compensation

2

Programs, Valuable Inventory, and Disallowed Interstitial Implementation. Compl. ¶ 101. Regarding the Pages That Offer Compensation Programs policy, which is a variant of the Incentivized Traffic policy, Google stated that Unlockd violated the policy because "[u]sers are currently incentivized to view ads each time they unlock their phones. Placing Google ads on these pages may result in invalid impressions or clicks and is therefore prohibited." Compl. ¶ 102. Regarding the Valuable Inventory policy, Google stated "[a]t present there is no content for the user other than viewing ads and receiving rewards. Our policies require that apps have more original content than ads in order to monetize." Compl. ¶ 103. Regarding the Disallowed Interstitial Implementation policy, Google stated "[a]ds can't be placed in applications that are running outside of the app environment. Every time the user unlocks their screen it triggers an ad outside the app." *Id.*

Without modifying any apps, Unlockd successfully appealed to Google in October 2017 by explaining why its business model did not violate Google's policies. Compl. ¶¶ 110-112. However, on January 23, 2018, Google reversed its decision and sent Unlockd a report of all its alleged violations. Compl. ¶ 120.

Unlockd alleges that Google acted pretextually as evidenced by its unwillingness to meet and "the fact that Google has allowed other apps with similar features to be distributed through the Google Play Store and source ads through AdMob." Compl. ¶¶ 105-108, 120-129, 132-133. Google followed up on March 2, 2018, describing violations of AdMob and Google Play Store policies, including: (1) Encouraging Clicks; (2) Valuable Inventory; (3) Disallowed Interstitial Implementation; and (4) Interfering with Apps, Third-party Ads, or Device Functionality. Compl. ¶¶ 120-129. Unlockd claims that Google only provided an explanation for the Interfering with Apps, Third-party Ads, and Device Functionality policies, characterizing the requirement that "[a]ds be served only within the app environment." Compl. ¶ 128.

Additionally, Unlockd asserts that Google takes a range of independent measures to limit expansion and generate barriers to entry in the digital advertising market. Compl. ¶¶ 162-170. Unlockd alleges that Google maintains a "vast collection of consumer data, which advertisers need to properly target their ads," and uses this "data to help advertisers optimize their targeting of

3

consumers," creating a barrier to entry that is difficult for would-be rivals to overcome. Compl. ¶ 162. Unlockd also charges that Google phases out third-party cookies that track user data on its web browser, which will "deepen Google's data advantage." Compl. ¶ 163. Additionally, Google purportedly leverages its "market power in adjacent markets, such as online search engine services and licensable mobile OSs, to foreclose competition in the digital advertising market" by requiring Google to be the default search engine on smart phones and watches. Compl. ¶¶ 164-170.

Unlocked alleges that Google's anticompetitive conduct is revealed by its investment in a technology start-up called Glance in December 2020, almost two years after Unlockd's alleged exclusion. Compl. ¶ 10, 145. Glance is a lock-screen platform company that provides content, including stories, news games, events, and advertisements to users in India before or upon unlocking their devices. Compl. ¶¶ 10, 145-147. Glance provides its content from its own "proprietary platform," not AdMob, and has an unknown monetization strategy. Compl. ¶ 147.

The above course of conduct allegedly resulted in Unlockd being removed from the Google Play Store on June 8, 2018, and ultimately led to Unlockd's bankruptcy. Compl. ¶¶ 9, 141. Unlockd contends that Google acted pretextually to give "Unlockd the run-around . . . and refused all attempts to arrive at a mutually acceptable solution." Compl. ¶¶ 8, 125, 130-132, 174. Unlockd claims that its removal from the Google App Store did not solely hurt itself, claiming that "Unlockd and Google yielded millions of dollars of revenue for Google, as well as other benefits to the Android ecosystem generated by Unlockd's apps." Compl. ¶ 173. Unlocked also alleges consumers and advertisers were harmed by Plaintiff's removal from the digital advertising market because its exclusion reduced consumer choice, decreased total supply, and disincentivized potential competitors from entering the market, leading to "increased prices, reduced innovation and quality of service, and lowered output." Compl. ¶ 178.

## II. REQUEST FOR JUDICIAL NOTICE

In support of their motion to dismiss, Defendants seek judicial notice, or consideration under the incorporation by reference doctrine, of the following documents: emails referenced in the Complaint, Exs. 1-4; the Google Play Developer Distribution Agreement, Ex. 5; the Google Adsense Terms of Service, Ex. 6; and a screenshot from the Federal Reserve website showing the

foreign exchange rate between Australian and U.S. dollars on March 4, 2022, Ex. 7. Dkt. No. 61-1.  Plaintiff opposes the request.  Dkt. No. 68.

The Court DENIES Defendants' request to find Exhibits 1 through 4 incorporated by reference, at least for the purpose advanced in that filing.  First, those communications "do not form the basis of the complaint."  And more fundamentally, even if the Court were to consider these documents as "extensively relied upon," it could not take Defendants' next requested step and rely on them to undermine the substantive truth of Plaintiffs' allegations.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002,1014 (9th Cir. 2018) (explaining that "[a]lthough incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents, we reiterate that it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."  That is what Defendants are asking the Court to do here:  they contend, for example, that contrary to Plaintiffs' allegations, "while Google had clarified it would not be engaging in further discussion regarding re-enabling Unlockd's ***existing*** apps without compliance changes, it did not shut down the conversation and wholesale refuse to 'substantively engage' with Unlockd."  Dkt. No. 61-1 at 5-6 (emphasis in original).  Consideration of the substantive meaning of these communications between the parties is thus appropriately deferred to summary judgment or trial.  *See M.O.R.E., LLC v. U.S.*, No. 12-cv-03609-JST, 2015 WL 5093621, at *3 (N.D. Cal. Aug. 28, 2015) ("The incorporation by reference doctrine 'is a narrow exception aimed at cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgement.'" (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998))).  This approach is "consistent with the prohibition against resolving factual disputes at the pleading stage."  *Khoja*, 899 F.3d at 1003.

The Court GRANTS the request as to the Google Play Developer Distribution Agreement and the Google Adsense Terms of Service because the provisions in those policies are extensively referenced and do appear to form the basis of Plaintiff's antitrust claim.  *See Khoja*, 899 F.3d at 1002.  But again, the Court does not accept the truth of any representation in these documents to resolve any factual dispute between the parties at this stage, given that it grants the motion solely

5

based on failure to plead antitrust injury as explained below.

Finally, the Court takes judicial notice of the Federal Reserve's posted foreign exchange rate between Australia and the U.S. on March 4, 2022, because this information is publicly available and not subject to reasonable dispute. *See Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020*)* ("Exchange rates listed on the Federal Reserve's system are a fitting subject of a request for judicial notice.").

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). If the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127

1  (9th Cir. 2000) (en banc) (quotation omitted).

## IV. DISCUSSION

Defendants move to dismiss on the grounds that Plaintiff fails to plead antitrust standing or the elements of its attempted monopolization claim. Because the Court finds that Plaintiff's failure to plead antitrust standing is dispositive, the Court does not reach Defendants' alternative arguments.

"Antitrust standing is distinct from Article III standing. A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999) (citation omitted). "To conclude that there is antitrust standing, . . . a showing of antitrust injury is necessary, [although] not always sufficient, to establish standing under § 4." *Id.* at 1055 (cleaned up and quotations omitted).

There are four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). "With respect to the second element, a plaintiff must allege some credible injury caused by the unlawful conduct." *Id.* (cleaned up and citation omitted). The harm must be to competition: "removal of one or a few competitors need not equate with injury to competition." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989). "Only when the restraining force of an agreement or other arrangement affecting trade becomes unreasonably disruptive of market functions such as price setting, resource allocation, market entry, or output designation is a violation of the Sherman Act threatened." *Id.*

Defendants argue that Plaintiff, at most, alleges a breach of contract by Google that harmed Unlockd, rather than asserting antitrust injury to market wide competition, and that Plaintiff's theory of harm is economically implausible. Mot. 8-13. Plaintiff responds that Defendants' conduct harmed the entire digital advertising marketplace, not just Plaintiff, and that the economic injuries alleged are the kind that antitrust laws seek to prevent. Opp. at 11-15.

The Court finds that Plaintiff's sufficiently-pled factual allegations are limited to harm

7

suffered solely by the Plaintiff, rather than to the digital advertising market as a whole. At its core, the Complaint details how Defendants' acts allegedly caused Unlockd to lose profits and ultimately go out of business. *See, e.g.,* Compl. ¶¶ 182, 184–85, 189, 190. But to the extent Plaintiff alleges that Defendants' actions "harmed competition, advertisers and consumers in the Digital Advertising Market, not only Unlockd," Opp. at 11 (citing Compl. ¶¶ 171-175, 181-185), the Court finds these allegations conclusory and insufficient to state a claim. Unlockd alleges that had Google permitted its app to continue operating, it would have: (1) lowered prices for advertisers by "increasing the total supply of digital advertising"; (2) benefited consumers by providing a "source of relevant ads and other content, not to mention a valuable rewards opportunity that allowed them to share in the advertising revenue"; and (3) provided an incentive for "other would-be rivals" to provide a similar product. Compl. ¶ 178. But these types of generic assertions are not enough without backing facts sufficient to make these claims plausible. *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110 (N.D. Cal. 2022) ("To plead antitrust injury, one cannot merely recite the bare legal conclusion that competition has been restrained unreasonably. . . .") (quotations and internal brackets omitted) (citing *Brantley v. NBC Universal*, Inc., 675 F.3d 1192, 1198 (9th Cir. 2012)).

Similarly, the Complaint asserts that had Plaintiff been permitted to stay on Google's platform, it would have "decreased prices and costs and increased innovation, quality of service, and output." Compl. ¶¶ 182-185. The Court finds these allegations equally conclusory because the Complaint fails to plausibly allege any output reduction or price increase that followed the removal of its app, or otherwise cite facts plausibly supporting these claims. *See Reilly*, 578 F. Supp. 3d at 1110 ("There is no allegation, for example, that the imposition of the guideline under which [plaintiff's app] was rejected or that the App Review process stifles marketwide output or increases prices."). Plaintiff asserts in its opposition that it was a "far from 'insubstantial'" company and that its advertising model posed a "a direct challenge to Google's business, and the threat was likely to grow significantly as Unlockd gained scale." Opp. at 15 (citing Compl. ¶¶ 82-95, 114-115 and 119- 134). But again, those paragraphs essentially just recount facts about what Unlockd was doing at various times, then simply assert that all of this meant that Unlockd was

8

such a threat that Google chose to eliminate it. More than just these sorts of high-level assertions are necessary to plausibly plead antitrust injury to *competition*, not just injury to Unlockd as a competitor. *See Coronavirus Rep. v. Apple Inc.*, No. 21-CV-05567-EMC, 2021 WL 5936910, at *13 (N.D. Cal. Nov. 30, 2021), *reconsideration denied*, No. 21-CV-05567-EMC, 2022 WL 307941 (N.D. Cal. Feb. 2, 2022) (granting defendant's motion to dismiss because plaintiff failed to plead antitrust injury based on "unadorned references to restricted output, quality, and innovation"); *Sayre v. Google, Inc.*, No. C 19-02247 WHA, 2019 WL 6036703, at *2 (N.D. Cal. Nov. 14, 2019) (holding that allegations of "Google Play and Google Web search results limit[ing] or hid[ing] [plaintiff] from consumer discovery" and causing defendant to lose access to the cell phone market were "not enough to support an antitrust claim because they only state injury to [plaintiff] and no other competitor").

To adequately allege antitrust injury at the dismissal stage, Plaintiff must "sketch the outline of the injury to competition with allegations of supporting factual detail." *Brantley*, 675 F.3d at 1198 (cleaned up). Plaintiff has not done so here. Accordingly, the Court finds that Plaintiff fails to plausibly allege cognizable antitrust injury in the digital advertising market.[2]

\\
\\
\\
\\
\\
\\
\\

---

[2] Because Plaintiff does not allege it operated in the search-engine marketplace, Plaintiff's argument that Defendant undertook allegedly exclusionary practices of cultivating consumer data and phasing out third-party cookies on its browser in a manner that prevents third parties from gathering data is not relevant to this claim. *Reilly*, 578 F. Supp. 3d at 1110 ("Plaintiff cannot demonstrate antitrust injury sufficient to sustain his claims through references to alleged anticompetitive acts that have no relation to Plaintiff or the harm that he experienced.").

9

## V. CONCLUSION

The Court **GRANTS** Defendants' motion to dismiss the Complaint. At this stage in the litigation, the Court cannot say that amendment would be futile. *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless the pleading could not possibly be cured by the allegation of other facts.") (quotation omitted). Plaintiff may file an amended complaint within 21 days of the date of this order.

**IT IS SO ORDERED.**

Dated: 9/22/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge