UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNLOCKD MEDIA, INC. LIQUIDATION TRUST,<br><br>  Plaintiff,<br><br>  v.<br><br>GOOGLE LLC, et al.,<br><br>  Defendants. | Case No. 21-cv-07250-HSG<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 110 |

Pending before the Court is the motion to dismiss Plaintiff's Second Amended Complaint filed by Defendants Google LLC, Google Ireland Ltd., Google Commerce Ltd., and Google Asia Pacific Pte. Ltd. (collectively, "Google" or "Defendants"). Dkt. No. 110. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **GRANTS** Defendants' motion to dismiss.

I.   **BACKGROUND**

   A.   **Factual Background**

The parties are familiar with the facts alleged in the case and the Court repeats them here only as relevant to the pending motion. Plaintiff Unlockd Media, Inc. Liquidation Trust initially filed this case in September 2021.[1] Dkt. No. 1. In the Second Amended Complaint, Plaintiff alleges that Defendants drove Unlockd out of business and into bankruptcy by banning Unlocked

---

[1] Plaintiff was established in August 2021 under a liquidation trust agreement between the bankruptcy estates of Unlockd Media, Inc. and Unlockd Operations U.S., Inc. *See* Dkt. No. 102-4 ("SAC") at ¶ 12. After filing petitions for bankruptcy, Unlockd Media and Unlockd Operations transferred all their assets, including any and all claims against Defendants, to the trust. *See id.* at ¶¶ 13–16.

from Google platforms. *See* SAC at ¶ 3. Unlockd created a smartphone application in which users could opt in to "receive full-screen mobile ads or content upon unlocking their Android smartphones . . . ." *See id.* at ¶¶ 4–5, 52–53. In exchange, users "received virtual 'points' that they could redeem for rewards such as mobile credit, subsidized streaming services, additional loyalty points, or in-app benefits like extra lives in mobile games." *See id.* at ¶¶ 4–5, 52–53, 57. Plaintiff alleges that its technology also allowed advertisers to take advantage of "access to consumers at their most engaged moment" when unlocking their smartphones, and to gather large amounts of data about users, including their location each time they unlocked their phones. *Id.* at ¶¶ 4–5, 52–53, 56.

Unlockd relied on the Google Play Store to distribute its smartphone app and on Google AdMob to connect Unlockd with prospective advertisers. *See id.* at ¶¶ 6, 31, 54, 70. Plaintiff acknowledges that it is subject to the terms and conditions of the Play Store and of AdMob, known as Google's Developer Distribution Agreement and AdSense Terms of Service (the "Agreements"). *See id.* at ¶¶ 25–27. Plaintiff alleges that in April 2017, Google stated that under its policies "ads can only be shown in the app environment" and that an app cannot "encourage users to click adds." *Id.* at ¶ 77. Following a June 2017 meeting, Plaintiff claims that Google nevertheless "represent[ed] to Unlockd that its apps did not violate Google policy." *Id.* at ¶¶ 79–81, 96.

However, in September 2017, Google disabled Unlockd's apps on AdMob, stating that they violated the "Incentivized Traffic" policy. *See id.* at ¶ 97. In an email, Google explained that "AdMob publishers are not permitted to place AdMob ads on applications with content related to programs offering incentives to click links or ads, read emails, or visit other applications or websites," such as "auto-surf apps, pay-to-read email networks, and apps comparing various pay-to-click programs." *Id*. A few days later, Google provided a formal "AdMob Publisher Policy Violation Report," stating that Unlockd had violated three distinct policies: "Pages That Offer Compensation Programs"; "Valuable Inventory"; and "Disallowed Interstitial Implementation." *Id.* at ¶¶ 101–02. Specifically, Google explained that Unlockd had violated:

- The "Pages That Offer Compensation Programs" Policy because "[u]sers are currently

incentivized to view ads each time they unlock their phones." *Id.* at ¶ 102. Google further explained that "[p]lacing Google ads on these pages may result in invalid impressions or clicks and is therefore prohibited." *Id.*

- The "Valuable Inventory" Policy" because "[a]t present there is no content for the user other than viewing ads and receiving rewards." *Id.* at ¶ 103. Google stated that its policies "require that apps have more original content than ads in order to monetize." *Id.*

- The "Disallowed Interstitial Implementation" Policy because "[a]ds can't be placed in applications that are running outside of the app environment." *Id.* And here, "[e]very time the user unlocks their screen it triggers an ad outside the app." *Id.*

Unlockd appealed Google's decision through its online portal, explaining how its business model worked and why it did not violate AdMob policies. *See id.* at ¶¶ 110–111. A member of the Google policy team reviewed the appeal and briefly reenabled Unlockd's AdMob access. *See id.* at ¶ 112. However, in January 2018, Google reversed its decision and once again sent Unlockd a report of all its alleged policy violations. *Id.* at ¶ 120. Google gave Unlockd until March 31, 2018, to address these alleged violations or it would discontinue Unlockd's access to AdMob. *See id.* In March 2018, Google sent another letter to Unlockd reiterating that Unlockd's apps violated AdMob policies, and also indicating that Unlockd's app violated Google Play Store policy. *See id.* at ¶¶ 126–128. The alleged policy violations, Plaintiff urges, were pretextual. *See id.* at ¶ 132. Plaintiff suggests that Google removed the Unlocked app from the Google Play Store and AdMob once it perceived Unlockd as a threat in the digital advertising market. *See id.* at ¶¶ 7–8, 10, 55, 93–94, 130, 174, 211, 223. Plaintiff claims that Defendants have allowed other apps with similar features to be distributed on the Google Play Store and source ads through AdMob. *See id.* at ¶¶ 132–134, 144–148, 175, 226. Plaintiff alleges that Defendants have, in fact, invested in another similar technology startup called "Glance." *See id.* at ¶¶ 10, 145–49, 180, 226. According to Glance's end user license agreement, it "enables end-users to explore and discover content or services through lock-screen including interesting stories, news, events, games, advertisements, etc." *Id.* at ¶ 147.

3

1    Based on these allegations, Plaintiff brings a single claim for attempted monopolization
2    under Section 2 of the Sherman Act. *See id.* at ¶¶ 258–266. Plaintiff alleges that the relevant
3    market is the "Digital Advertising Market," in which "advertising [is] delivered to consumers
4    personally through the internet on their computers, smartphones, or other digital devices,
5    excluding classified advertising." *See id.* at ¶¶ 31, 35–36, 150. And according to the SAC, the
6    geographic scope of this market "covers advertising delivered to consumers located in the
7    predominantly English-speaking countries of the United States, Canada, the United Kingdom,
8    Ireland, Australia, and New Zealand," or alternatively, just the United States. *Id.* at ¶¶ 156–57.

### B.   Procedural Background

The Court granted Defendants' motion to dismiss the first amended complaint, concluding that Plaintiff failed to plead antitrust standing, as its "allegations [were] conclusory and insufficient to state a claim." Dkt. No. 101 at 8–9. Plaintiff amended its complaint, *see* SAC, and Defendants again move to dismiss. Dkt. No. 110.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031. Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead*

4

*Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

### III. REQUEST FOR JUDICIAL NOTICE

In support of their motion to dismiss, Defendants seek judicial notice of two documents: (1) a complaint filed by the United States Department of Justice in *U.S. v. Google*, Case No. 1:23-cv-00108, ECF No. 1 (E.D. Va. Jan. 24, 2023); and (2) a May 23, 2013 email from Google Employee Patrick Brady. *See* Dkt. No. 110-1. Plaintiff does not appear to oppose this request, *see* Dkt. No. 114, and the Court **GRANTS** it. However, the Court does not accept the truth of any representation in these documents to resolve any factual dispute between the parties at this stage. As explained in more detail below, the Court grants the motion to dismiss solely based on Plaintiff's failure to plead antitrust injury.

### IV. DISCUSSION

Section 2 of the Sherman Act makes it illegal to "monopolize . . . any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. "To establish liability under § 2, a plaintiff must show: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (quotations omitted). "[A]ntitrust injury consists of four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."[2] *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). In other words, a plaintiff must adequately allege that its injury "flows from an anticompetitive aspect or effect" of the defendant's behavior. *See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2011) (emphasis omitted). This threshold showing "ensures that a plaintiff can recover only if the

---

[2] The Ninth Circuit also requires a fifth element: "[T]he injured party [must] be a participant in the same market as the alleged malefactors," meaning "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007–08 (9th Cir. 2003).

5

loss stems from a competition-*reducing* aspect or effect of the defendant's behavior," such as from higher prices, lower output, or lessened quality. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original). Once again, Defendants argue that Plaintiff has failed to allege antitrust standing. *See* Dkt. No. 110 at 5–13. The Court agrees.

As before, Plaintiff discusses at length how it was harmed because Unlockd's apps were no longer available on the Google Play Store and Unlockd no longer had access to AdMob. Without such access, Unlockd was no longer able to compete in the Digital Advertising Market. *See, e.g.*, SAC at ¶¶ 214–15, 217, 219–20, 228–29, 241, 256. Such harm to Plaintiff alone, however, is not enough. "The antitrust laws do not provide a remedy to every party injured by unlawful economic conduct." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999). Rather, they "are only intended to preserve competition for the benefit of consumers." *Id.*; *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) ("[P]laintiffs must plead an injury to competition beyond the impact on the plaintiffs themselves."). As the Ninth Circuit has explained, of course "[t]here is a sense in which eliminating even a single competitor reduces competition." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987) (quotation omitted). "But it is not the sense that is relevant in deciding whether the antitrust laws have been violated." *Id. (*quotation omitted). "Only when the restraining force of an agreement or other arrangement affecting trade becomes unreasonably disruptive of market functions such as price setting, resource allocation, market entry, or output designation is a violation of the Sherman Act threatened." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989).

Recognizing this limitation, Plaintiff asserts that by removing Unlockd from the Google Play Store and denying it access to AdMob, Google has "caused anticompetitive harms to advertisers, consumers, and competing publishers" in the form of reduced choice, lower quality, and less innovative apps in the Digital Advertising Market. *See* SAC at ¶¶ 177, 265. Plaintiff asserts that Unlocked would have exceled had it been allowed to continue competing, ultimately increasing the total supply of digital advertising inventory and leading to lower prices for advertisers. *See id.* at ¶ 178; *see also id.* at ¶¶ 216, 218–19, 227–34, 240–41. Plaintiff also states

6

that prior to removal of its app from the Google Play Store and access to AdMob, Unlockd was planning an initial public offering ("IPO") and would have attracted significant investors. *See id.* at ¶¶ 8–9, 82, 95, 113–17, 139, 217, 228–34. Plaintiff further states that Unlockd's existence in the Digital Advertising Market would have "affected the basic elements of supply and demand in that market." *See id.* at ¶ 240. According to Plaintiff, Google's treatment of Unlockd also "disincentivized other would-be rivals from attempting to provide similar innovative advertising solutions . . . ." *Id.* at ¶ 178. At bottom, Plaintiff's argument collapses into a single conclusory point: Google's conduct caused harm to the market because consumers, advertisers, and publishers were unable to benefit from Plaintiff's innovative business model. *See id.* at ¶¶ 235–39, 243–46, 251–53.

But as before, the SAC lacks factual support for any of these conclusory assertions. Despite adding many paragraphs in the SAC, *see* SAC at ¶¶ 181–249, Plaintiff has added very little substance. At times Plaintiff even appears to acknowledge that it does not currently possess the necessary factual detail. Plaintiff notes, for example, that "[a]ny effort to quantify the precise effect of [its] exclusion on pricing and output (or supply) in the relevant market will be complicated by the size of the market and the variety of causal factors that affect pricing and supply." *See id.* at ¶ 240. Rather than attempt such an analysis, Plaintiff suggests that "the effect of excluding a competitor can be estimated by experts based on data that Google possesses." *Id.* Plaintiff may not delegate or postpone its burden to plead a plausible antitrust injury in this way.

Nor may Plaintiff simply defer to "fundamental economics" in pleading antitrust injury. *See id.* at ¶ 237. The Ninth Circuit has explained that "[o]f course, convergence of injury to a market competitor and injury to competition is possible when the relevant market is both narrow and discrete and the market participants are few." *Les Shockley Racing*, 884 F.2d at 508–09. But Plaintiff has alleged a large and diverse market. Plaintiff asks the Court to assume that removing its mobile apps from the Google Play Store and denying it access to AdMob raised prices and reduced the quality of the entire Digital Advertising Market, which it defines as "advertising delivered to consumers personally through the internet on their computers, smartphones, or other digital devices" in at least the United States (and potentially in several other English-speaking

7

countries). *See* SAC at ¶¶ 150, 156–57. But even drawing all reasonable inferences in Plaintiff's favor, as the Court must at this stage, Plaintiff has offered no factual support from which the Court could assume that harm to Plaintiff is somehow tantamount to harm to this entire market. Plaintiff's theory is also further undermined by its acknowledgment that similar products *do* continue to exist in the Digital Advertising Market. *See id.* at ¶¶ 134–135, 144–148.

The scope of the alleged market distinguishes this case from those Plaintiff cites. In *PLS.Com*, for example, the Ninth Circuit explained that the plaintiff PLS was a "new entrant" in the market for residential real estate listings "after decades of there being little or no competition in that market . . . ." 32 F.4th at 829. The defendant National Association of Realtors ("NAR") operated the vast majority of databases of homes for sale in certain geographic areas, known as multiple listing services or "MLS." *Id.* at 829–30. PLS operated a similar database, but unlike the MLS, it allowed sellers to choose how much information to share and to include real estate listings anywhere in the United States. *Id.* at 830. Because of the popularity of PLS, the defendant instituted a "Clear Cooperation Policy," which required agents to submit a listing to MLS once it was marketed publicly—such as on PLS—or face fines or suspended access to the MLS. *Id.* As alleged, this policy was intended "to maintain the market dominance of the NAR-affiliated MLS system," and it succeeded in doing so. *Id.* at 831. The plaintiff alleged that the policy decreased agents' use of PLS, preventing PLS from gaining a foothold in the market and making it virtually impossible for any new entrants to compete with MLS. *Id.* The Ninth Circuit concluded that the plaintiff had sufficiently alleged antitrust injury because the policy left "agents fewer choices, supra-competitive prices, and lower quality products," even though PLS was not completely driven out of the market. *Id.* at 840–41.

The Ninth Circuit in *PLS.Com* did not address the factual allegations supporting the plaintiff's asserted injury or the plausibility of the alleged harm to competition. But unlike the broad "Digital Advertising Market" alleged here, that case involved a narrow market in which the defendant had no meaningful competitors. Under such circumstances, it may have been plausible to assume that harm to a single (and perhaps the only) competitor actually affected competition more broadly. Plaintiff offers no explanation why such assumptions would be plausible here.

8

1    Similarly, in *NorthBay Healthcare Grp. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x
2    231 (9th Cir. 2020), the plaintiffs alleged that the defendant had only one "significant healthcare
3    insurance rival" in Solano County—Western Health Advantage, whose network included the
4    plaintiffs' hospitals. *Id.* at 234–35.  The plaintiffs alleged that the defendant engaged in two
5    schemes to monopolize the healthcare insurance market in Solano County and drive out Western.
6    Under the first scheme, the defendant would "steer" uninsured and indigent patients away from its
7    hospitals and toward the plaintiffs' hospitals, and "steer" insured trauma patients away from the
8    plaintiffs' hospitals and toward the defendant's hospitals. *Id.* at 234.  Under the second scheme,
9    the defendant terminated an agreement and began reimbursing plaintiffs at less than half the
10   previous rate. *Id.*  The plaintiffs alleged that as a result, they had to "curb future investment plans,
11   close departments, lay off employees, and reduce services available to the public." *Id.* at 235.  The
12   Ninth Circuit found such allegations sufficient to establish antitrust injury because such alleged
13   conduct—and the resulting cutbacks to the plaintiffs' hospitals—would "diminish the quality of
14   services for the public." *Id.*  But nothing in *NorthBay* suggests that alleged harm to a single
15   competitor is necessarily sufficient to plead antitrust injury.[3]

16   Plaintiff's reliance on *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24
17   F.4th 1262, 1267 (9th Cir. 2022), is likewise misplaced.  In *Ellis*, the defendant SRP controlled the
18   electrical grid for the Phoenix metropolitan area. *Id.*  SRP had the power to set prices for the sale
19   and distribution of electricity, and supplied more than 95% of the electricity used by customers in
20   that area. *See id.* at 1266.  SRP established a new pricing scheme under which customers who
21   generated their own electricity through solar-energy systems were charged up to 65% more for
22   SRP electricity. *Id.* at 1267.  The plaintiffs were customers subject to this new pricing plan, who
23   alleged that the plan "ma[de] it impossible for solar customers to obtain any viable return on a
24   solar energy system investment, thereby eliminating any competition [to SRP] from solar energy."
25   *Id.*  The Ninth Circuit found that the plaintiffs had sufficiently pled antitrust injury because they

---

[3] As an unpublished Ninth Circuit decision, *NorthBay* is not precedent, and may only be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.  However, the Court does not find that it persuasively supports Plaintiff's argument for the reasons discussed.

9

were forced to pay higher prices as a result of SRP's unlawful scheme to reduce solar energy competition.  Critically, the plaintiffs in *Ellis* alleged that they were actually forced to pay these higher prices because of the defendant's conduct.  The SAC here, however, lacks any such direct allegations of increased prices or other market harm.  Despite Plaintiff's insistence, these cases do not establish that Plaintiff's conclusory allegations are sufficient.

The only tangible allegation Plaintiff makes is in a single paragraph indicating that "digital advertising prices" rose from 2018 to 2022.  *See* SAC at ¶ 247.  Specifically, Plaintiff contends that "[t]he publicly available data for digital ads of the type that Unlockd was supplying for advertisers shows that average CPM (cost per thousand) rose steadily from 2018 to 2022."  *Id.*  But Plaintiff fails to provide even the most basic information about this data, such as what geographic area it included or even what kind of digital advertising it encompassed.  Moreover, even as alleged, Plaintiff suggests that there were many factors affecting these prices, including Google's unidentified "other anticompetitive conduct."  *See id.*  Thus, even assuming prices rose in the relevant market over time, Plaintiff has failed to provide any support for its contention that this had any plausible connection to its departure from the market.

In short, Plaintiff still offers nothing more than its repeated assertion that it was an innovative business and would have been a threat to Google in the Digital Advertising Market absent Google's alleged conduct.  Such unsupported conclusions are simply insufficient to allege antitrust injury.  *Accord Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110 (N.D. Cal. 2022) (finding plaintiff failed to establish antitrust injury where theory of harm was that his app was rejected from the Apple App Store); *Coronavirus Rep. v. Apple Inc.*, No. 21-CV-05567-EMC, 2021 WL 5936910, at *13 (N.D. Cal. Nov. 30, 2021) (rejecting "unadorned references to 'restricted output, quality, and innovation'" to support antitrust injury where apps were rejected from the Apple App Store or subject to alleged ranking suppression).

**V.     CONCLUSION**

The Court **GRANTS** the motion to dismiss.  Dkt. No. 110.  Plaintiff has had ample opportunity to state a claim for relief, but has repeatedly failed to do so.  The Court finds that granting leave to amend would be futile, and therefore **DISMISSES** the case without leave to

amend.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) ("[W]here the Plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, [t]he district court's discretion to deny leave to amend is particularly broad." (quotation omitted)).  The Clerk is therefore directed to enter judgment in favor of Defendants and to close the case.

**IT IS SO ORDERED.**

Dated:    2/20/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge